Julius W. **HOBSON**, individually and on behalf of Jean Marie Hobson and Julius W. Hobson, Jr., et al., Plaintiffs,

v.

Carl F. **HANSEN**, Superintendent of Schools of the District of Columbia, the Board of Education of the District of Columbia, et al., Defendants.

Civ. A. No. 82–66.

United States District Court, District of Columbia.

Dec. 22, 1970.

Stephen B. Ives, Jr. and Terrence R. Murphy, Washington, D. C., for intervenors.

C. Francis Murphy, Acting Corp. Counsel, District of Columbia, and John A. Earnest, Matthew J. Mullaney, Jr. and Thomas R. Nedrich, Asst. Corp. Counsel, for defendants.

J. SKELLY WRIGHT, Circuit Judge:*

This action by nine parents of white children at Gordon Junior High School asserts that a recent boundary decision by the Board of Education of the District of Columbia violates this court's order of June 19, 1967 in Hobson v. Hansen, D.D.C., 269 F.Supp. 401, which permanently enjoined discrimination on the basis of racial or economic status in the operation of the District of Columbia public school system. By order of September 15, 1970, these parents were permitted to intervene in the *Hobson* case to argue their motion for further enforcement of the 1967 decree.

## I

The specific act of the Board of Education challenged by intervenors relates to an amendment to the so-called "cluster plan" which the Board adopted for eight of the 30 junior high schools in the District of Columbia. The cluster plan permits a complete sixth grade graduating class to matriculate in one junior high school rather than have that graduating class dispersed into two or more junior high schools whose boundaries cut through the area served by the elementary school. The cluster plan, as recommended by the Acting Superintendent, proposed that Horace Mann and Phoebe Hearst Elementary Schools be placed in the Gordon Junior High School cluster. In adopting the cluster plan, however, the school board amended it so as to reverse this particular recommendation and transfer both Mann and Hearst Elementary Schools from the Gordon to the Alice Deal Junior High School cluster. It is this amendment which intervenors seek to enjoin the Board and the Superintendent of Schools from effecting.

## II

By its order of June 19, 1967, this court enjoined defendants from discriminating against poor and black pupils and required that they file in the record a plan of pupil assignment complying with the court's decree. On January 2, 1968, defendants filed a report in compliance with this directive, setting forth their intent to adopt redrawn junior and senior high school boundaries which "will not only increase socio-economic and racial integration but will also achieve maximum use of school buildings and insure an equitable distribution of staff." These same criteria were again listed by the president of the school board, under deposition by defendants, as being "generally used" in establishing boundaries. Nonetheless, the record shows that the objective effect of the school board's cluster amendment was—and that the Board was aware that the effect of the

* Sitting by designation pursuant to 28 U.S.C. § 291(c) (1964).

amendment would be—to move children from an undercrowded to an overcrowded school; to move white children from a school perilously clinging to its integrated status to an already whiter school; and to move relatively wealthier children, at the behest of their parents, from a school with a lower socio-economic standing to one with a higher standing.

In this connection, intervenors cite this court to its own notation in 1967 that the southern half of the area in the District west of Rock Creek Park was "Washington's most thoroughly integrated area, both residentially and in school enrollments." This is the area of Gordon Junior High School, which was at the time the only junior high school in the "integrated" 33 to 67 per cent range of racial division. 269 F.Supp. at 440, 452. Intervenors are parents whose children attend Gordon and who are concerned to preserve its unique possibilities for providing an integrated education. Intervenors state that the undercrowded condition of Gordon, exacerbated by the transfer of Mann and Hearst to the Deal cluster, will undoubtedly lead to pupil transfers to Gordon from elsewhere, as was the case a year ago. Except for Gordon and Deal, no junior high school in the District has any substantial white enrollment, and transfers into undercapacity Gordon will therefore have to come from predominantly black junior high schools. Intervenors have argued that there is a tipping point in the life of an integrated school, past which changes in the racial composition of the school intensify and "snowball." While they admit that the integrated status of Gordon is in jeopardy primarily because of the voluntary exodus of white children from the District of Columbia public school system,[1] intervenors ask this court to prevent and undo any affirmative action on the part of the Board itself which furthers the dis-integration of Gordon and brings it perilously close to the tipping point.

While admitting the cluster plan amendment will have some adverse effect upon its goals of reducing crowding and maximizing integration, the Board claims that the "deviation from its boundary criteria is only" de minimis. According to defendants, as of October 22, 1970, Gordon is at 85 per cent of capacity and Deal is at 114 per cent of capacity. Had the pupils from Hearst and Mann attended Gordon instead of Deal, Gordon would be at 87 per cent of capacity and Deal would be at 113 per cent of capacity. Had the 18 white and three black pupils from Hearst and Mann attended Gordon instead of Deal, the number of whites at Gordon would be raised from 85 to 103, an increase of 21 per cent, and the enrollment in the seventh grade of Gordon on October 22, 1970 would be 35 per cent white instead of 31 per cent white as it now is.[2]

In support of their contention that these objective effects of the boundary decision are de minimis, defendants stress the context of this decision. Defendants first state that on October 16, 1969, the enrollment in the seventh grade at Gordon was 67 per cent white, while approximately a year later, on October 22, 1970, the enrollment in the seventh grade at Gordon is 31 per cent white. In view of the 32 per cent exodus of white students from Gordon, which is admittedly beyond their control, defendants argue that the extra four per cent loss caused by their boundary decision is relatively minor. Defendants also state that there were countervailing justifications for their decision, namely that Deal was closer to the pupils' homes and that some of the pupils had older siblings already attending Deal. They further assert, from their experience with busing of pupils from overcrowded

---

1. *See* text at page 722, *infra.*

2. Although the facts do not permit the court to know with mathematical precision the socio-economic effect of the

Board's decision, the president of the Board also indicated in her deposition that the Board was aware that the transferred children were of "higher socioeconomic class."

schools, that parents, be they black or white, are willing to tolerate some overcrowding for the sake of convenience of transportation or preservation of family routine, particularly in the absence of any evidence that some overcrowding damages the educational offering. Defendants' position is that the Board of Education has demonstrated a valid purpose in clustering Hearst and Mann Elementary Schools with Deal Junior High School and that the burden of proof now rests with intervenors to show that the Board of Education was motivated by a segregatory purpose.

Without conceding that the segregatory effect of defendants' action is *de minimis*, intervenors have sought to meet defendants on the issue of segregatory intent. Although the analysis of the objective results of the Board's decision reveals only a relatively small segregatory effect, the mere fact that the Board made such a decision—a decision which admittedly went counter to its own established criteria for boundary decisions—is itself suggestive, though not determinative, of such intent. Bearing this in mind, the court will now turn its attention to the other evidence offered by intervenors in their attempt to establish the Board's segregatory intent.

### III

Intervenors urge the court to remember that the Gordon/Deal area of Washington has a history of segregatory intent. They cite to a portion of the 1967 opinion which banned the use of "optional zones," one of which was in the Gordon/Deal area:

"* * * One other optional zone eased the withdrawal of students from an integrated junior high (Gordon) into the city's one predominantly white junior high school, Deal. * * Beginning back in the 1940's when both were Division I white high schools, an optional zone lay between Wilson and Western Senior Highs. At that time Deal fed into Wilson, Gordon into Western; these are today's arrangements also. The Wilson-Western optional zone until 1963 fell entirely within Gordon's province. Parents in the zone who preferred Wilson High School complained to Superintendent Hansen about the junior high assignment to Gordon. Ostensibly their reasoning was that their children suffered the awkwardness of having to acquire wholly new classmates when they graduated from Gordon into Wilson, and that families were inconvenienced by having children simultaneously attending Gordon and Wilson, at opposite directions from the zone itself. In 1963 the Superintendent, in response to these complaints, converted the zone from compulsory Gordon to Gordon-Deal optional territory. Two years later, admittedly because a civil rights group publicly argued that the zone parents were principally seeking a white school, the Superintendent changed directions, not only returning the junior high optional zone to the Gordon district, but merging the senior high zone into the exclusively Western district.

"Although, the Superintendent testified, the 1963 change was an 'unwise decision because of the racial overtones,' 'The racial overtones,' he said, 'are interjected into this by others.' * * * The zone parents' pre-1963 professed non-racial grievances do, however, seem disingenuous, since the inconvenience they cited they had invited upon themselves by choosing Wilson rather than Western High School for their older children. Further, that the Superintendent granted such relief upon the civil rights group's protest evidently reflected his concession that one apparent intent of the zone parents was segregatory. Accordingly, the court finds that the underlying motive of at least some of the zone parents, not unappreciated by the Superintendent, lay in their preference for the greater white enrollment at Deal and Wilson."

269 F.Supp. at 417.

Thus with the exception of the period from 1963 to 1965 Mann children had al-

ways graduated into Gordon. In 1963, in response to parental complaints which the court later found to be at least partially segregatory in intent, Mann parents were permitted the option of sending their children to Deal. But in 1965, "because a civil rights group publicly argued that the zone parents were principally seeking a white school," this option was eliminated. As stated before, on January 2, 1968, in compliance with this court's decree, defendants filed a report setting forth their intent to adopt redrawn junior and senior high school boundaries which "will not only increase socio-economic and racial integration but will also achieve maximum use of school buildings and insure an equitable distribution of staff." The committee set up by defendants to carry out this provision moved the Gordon/Deal boundary northward, to include all of Mann and half of Hearst in the Gordon area. In discussing the overall boundary problems, the committee stated:

"Where to start? We elected to try first to achieve what possible improvement in racial integration could be achieved by moving pupils from Wilson and Deal into Gordon and Western."

This committee's recommendations were accepted by the Board and put into effect for the 1968–69 school year.

In the 1969–70 school year, however, the Board transferred a small portion of the Hearst district, containing several white junior high students, from Gordon back to Deal. Then on July 1, 1970, the Board moved Mann and Hearst from the Gordon cluster to the Deal cluster, reversing the recommendation of the Acting Superintendent. Intervenors stress that the effect of this action, plus the small 1969 change, has been totally to abandon the line drawn by the 1968 boundary committee and originally approved by the Board.

At oral argument, counsel for defendants made a strong plea against any use by this court of the 1963–65 Gordon/Deal optional zone as evidence of a current segregatory intent on defendants' part. While the court is aware of the danger of inferring guilt in the present from a finding of guilt in the past, it does feel that a history of segregatory intent is not completely irrelevant to the inquiry whether such intent continues in the present. The same unseen pressures which caused the Board's prior segregatory action may well have been effective again. The court therefore notes the history of the Gordon/Deal area for whatever contextual or background value it may have in evaluating the other evidence of segregatory intent presented by intervenors, and turns now to their other evidence.

In its decision to move Mann and Hearst from Gordon, the Board relied heavily upon the wishes of a limited number of parents in the school district concerned, which were conveyed to the Board by Mr. Rosenfield, the ward representative on the Board. Mr. Rosenfield conceded that his motivations in suggesting the boundary change in the Acting Superintendent's proposed cluster plan were political, and he further suggested that the parents concerned were influential, specifically mentioning the Congress. The transcript of the meeting of July 1 speaks for itself:

MR. ROSENFIELD: Madam Chairman, last year when many citizens from Ward 3 indicated a desire for the cluster school approach, if you recall, I made the motion for its adoption. The motion was tabled because it was felt by many Board members and the Administration that perhaps we ought to look at it after further study on a city-wide basis.

I want to commend the Administration for its approach and I know it is going to make a lot of people very happy that there is continuity in our educational programs in the Ward I represent. But I would like to amend the motion to include Hearst Elementary School and Mann in the feeder concept to Deal Junior High School. There are not that many students involved, but I think that at Hearst, for example, there are supposedly 34 students who would be going to the school recommended by the Administration.

That is, the assumption all 34 would go. We do know 18 out of the 34 live above the present boundary. This school happens to be split in half almost with the boundary changes made three years ago. And from the feedback I get from the community, I urge the Board to support me in this.

Mann Elementary School, I think, could be a move in the right direction. I think it would indicate that we do care for a certain segment of our society. I think it would be very helpful. They live closer to Deal or Wilson than they do where they presently have to travel and I urge consideration for my amended motion from the Board of Education.

\*    \*    \*    \*    \*    \*

MRS. TAYLOR: I would like to ask the Superintendent what implication he sees in this. It seems to me this is an administrative matter that we are trying to cut in here. I would like very much to be able to support my colleague, but I would like to know what I am doing here.

I notice that Deal as the present cluster indicates would be 8.80 percent overcrowded and Gordon would only be 1.10 percent overcap[a]city. If we make these shifts, we are shifting to the school that is already showing the greater amount of overcrowding, and I would just like to know what this means. This would be for seventh grade. Now, we would be adding these additional seventh graders, and can Deal handle them?

\*    \*    \*    \*    \*    \*

MR. HENLEY: We did hear some rumblings with reference to taking the Hearst children out of the cluster as we have it and transferring those children to Deal. There seems to be some merit to that request, because a large number of those children do not normally go to Deal. We can find no justification in our own minds with reference to the transfer of Mann children to Deal Junior High School. You will realize that we are now under suit because of per-pupil expenditure. Transfer, as we see it, of these students, would raise Deal Junior High School to 113 percent, Gordon Junior High School would then go under 100 percent. That is why we stuck with what we have here, with the possible exception we could use some Hearst children.

I think that is the report I got from the Elementary School Office.

\*    \*    \*    \*    \*    \*

MR. ROSENFIELD: \* \* \*

As far as Mann is concerned, perhaps I am politically oriented in looking at it—you can laugh at it—but I am trying to work for 150,000 children, and if there is one pocket that can help 149,964 children, I think we ought to utilize that strength. First of all, they are closer to the particular feeder school—Deal. And again, I have gone over this, I had weeks of speaking with the community. And you all know, Board Members, what community pressure is.

I am trying to do it, I am trying to do it logically, and I think every indication points to the granting of this wish. Certainly it is a Ward problem, it does not affect city-wide problems.

I was in support of this cluster plan last year, I made the motion, and I am glad it is a reality today. I just ask for a minor change to make this a workable situation.

\*    \*    \*    \*    \*    \*

MR. HANCOCK: I would like to speak to the motion, also. We are speaking of the numbers of 27, 10, 15, a few percentage points. Running through some papers looking for some application forms, I found a speech that I delivered to the Board of Education regarding secondary school boundaries. No one took into consideration the wishes of my community, which I represented at the time they made boundary changes, which resulted in a similar problem of children taken away f[ro]m a school from the virtual back door of Miller Junior High School and sent to Roper.

I am opposed to this inflexibility of any school system. Whereas I respect the Wright Decree, socio-economic mix, and what-not, we are doing business with human beings. This has caused a considerable amount of inter-rivalry and dissatisfaction among parents, students, and everybody. Kids walking past or traveling past a building in their immediate vicinity to go to another building to satisfy a few percentage points accentuates the inflexibility of this system.

As Mr. Rosenfield said, and I support the fact, that the Ward representatives have the responsibility, they are under tremendous pressure to make things work in their community. This is in Ward 3, and I think the Ward members have a responsibility to each other.

I might bring a proposal in here next week requesting some relief about a situation. I have had parents call me as late as March, saying they were two blocks out of boundary and had to leave a school in March and go to another school. They were quite disturbed about upsetting the children. These percentage points are good, maybe they stand up in court. I don't know, but we are doing business with human values, human beings.

This is a request and I intend to support the request, based on the community wishes and wishes of the Ward representative. I had a similar problem in my Ward; I understand what this has created. I know the school system administrator is trying to do the right thing, but I do not think it is wisdom to sen[d] a child past a school that families have attended for years to satisfy a percentage point.

\* \* \* \* \* \*

MR. ROSENFIELD: Mrs. Swaim, I am terribly concerned and I am dedicated, and no one will move me from the position that I believe the only hope there is left for an integrated school system is in Ward 3, and nowhere in my literature that I stated during the campaign—there are some ladies right here in the audience who did not vote for me—did I not say a sick Fourteenth Street is not conducive to a healthy Connecticut Avenue.

I have 39 years of District of Columbia residence. I am not a mush-head liberal, nor am I a Birch right-winger, but I know one thing, I try to be realistic, and when I see 10 percent of the children not coming back, you und[er]stand, from the area in Ward 3, I am concerned. Because they are not only white children, they are black children, too, and as we move to meet the needs of services in our city beyond educational needs, you know we must have a tax base. And pulling money from the Congress is like pulling tee[t]h without Novocain, and all of you understand what I am talking about.

I say that the Mann area can serve a useful purpose, both for the children in providing them a school that is closer to their home and increase their enrollment and other areas that I do not want to say publicly. \* \* \*

Intervenors challenge both of Mr. Rosenfield's ostensible reasons for his modification of the proposed cluster plan as being mere rationalizations of segregatory intent. With reference to the argument that Mann/Hearst children should attend Deal on the ground that it is closer to their homes than is Gordon, intervenors point out that, although Mann and Hearst are marginally closer to Deal than to Gordon, West—a primarily black elementary school clustered to Deal—is farther from Deal than either Mann or Hearst. By the same token, other schools in the cluster program are farther from the junior high school into which they are clustered than from other junior highs. As to the argument that Mann/Hearst parents seek to have their children attend Deal because older siblings are at Deal or nearby Wilson High School, intervenors point out that the change will mean that new seventh graders with brothers and sisters already at Gordon and Western High School un-

der the earlier boundary lines will not attend school with their siblings.

Although the court in its 1967 decree did not ban the neighborhood school policy, it did hold improper the use of this policy as an excuse for discrimination in pupil assignment, or as a way to increase segregation or to avoid "maximum effective integration." 269 F. Supp. at 515, 417–418. The 1967 opinion also states clearly that "the fact that the Board believes in neighborhood schools for racially neutral reasons which alone suffice to explain the initiation and retention of that policy does not settle the matter; for these facts in no way cancel the possibility that the Board has concurrently favored it for racial reasons which are forbidden. If a valid purpose is in fact joined by an outright segregatory purpose, the court has no doubt that a *de jure* case has been established." 269 F.Supp. at 418.

There is evidence in the record, then, that, in changing Mann and Hearst from Gordon to Deal, the Board of Education was aware of and responded to neighborhood pressures to permit a small number of wealthy white children to escape from a school increasingly black, with numbers of them characterized by the president of the Board as "not prepared to go there." Allen deposition, p. 49. Defendants as much as admit the truthfulness of intervenors' allegations about the segregatory intent of Mr. Rosenfield when they urge in their proposed findings of fact and conclusions of law that this court should eschew "guessing at the intentions of the Board of Education based upon the statements of a single member of the Board, even though that member offered the amendment, for the amendment passed unanimously, and what motivates one member to make a speech about an amendment is not necessarily what motivates other members to enact it." But the court believes that the Board's actions cannot be accurately viewed apart from the factual and historical context developed above. Placed in context, the act of the Board as a whole must be seen as

a knowing ratification of Mr. Rosenfield's segregatory rationale.

## IV

The facts as seen by the court are that the school board is under an injunction against racial or social discrimination, and that it has violated this injunction by knowingly taking a pupil placement action which permits white children to escape an increasingly black school. This court's earlier opinion states clearly that, when the school board is aware of a segregatory purpose behind the stated basis for a boundary change and when the stated reasons for such change are unconvincing, its passage of such a boundary change violates a decree against discrimination. 269 F. Supp. at 417, 499–500.

This action is brought by nine white parents who desperately want their children to have the value of an integrated education. They rely on the decree of this court's 1967 opinion for their legal support, and on the primary finding therein for the theoretical foundation of their position. *Hobson's* first finding is that "[r]acially and socially homogeneous schools damage the minds and spirit of all children who attend them—the Negro, the white, the poor and the affluent—and block the attainment of the broader goals of democratic education, whether the segregation occurs by law or by fact." 269 F.Supp. at 406. Neither this court nor the school board can do anything, of course, to eliminate segregation which arises from the migration of white children to private or suburban schools. But any action by the Board itself which further imperils the integrated status of one of the few remaining District schools where real integration is possible amounts to an exacerbation and ratification of this larger trend and must be treated by this court as a violation of its 1967 decree. Wherefore

It is ordered, adjudged and decreed that the defendants, their successors, agents, officers, employees, and all those in active concert and participation with

them be, and they are hereby, enjoined from:

1. Transferring or assigning the areas of Horace Mann and Phoebe Hearst Elementary Schools, or either of them, to the Alice Deal Junior High School area for purposes of pupil placement, whether as part of the Alice Deal Junior High School "cluster" or otherwise, and from

2. Implementing or carrying out the decision of the Board of Education on July 1, 1970 to accomplish the same.

It is further ordered, adjudged and decreed that, on or before January 15, 1971, defendant members of the Board of Education file with this court and serve upon intervenors a plan for the prompt transfer to and placement in Gordon Junior High School of those seventh grade students who formerly attended Horace Mann and Phoebe Hearst Elementary Schools and who are now at Alice Deal Junior High School.