**Effie Arcala HIGHTOWER, etc., et al.,**
**Plaintiffs-Appellants,**

v.

**Paul D. WEST, etc., et al., Defendants-**
**Appellees.**

**No. 29933.**

United States Court of Appeals,
Fifth Circuit.

July 14, 1970.

Rehearing Denied Sept. 11, 1970.

Howard Moore, Jr., Peter E. Rinds-kopf, Atlanta, Ga., Jack Greenberg, Norman J. Chachkin, New York City, for appellants.

James P. Groton, Atlanta, Ga., for appellees; Sutherland, Asbill & Brennan, Atlanta, Ga., of counsel.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

We consider here the desegregation plan of the Fulton County, Georgia, school system.[1] This school system encompasses urban, suburban, and rural areas outside the city limits of Atlanta. Fulton County, 70 miles long runs, approximately north-south, the City of Atlanta in its middle. The black population is concentrated in the southern half of the county. The area north of Atlanta is known as "North County". Immediately to the south of Atlanta are Hapeville, College Park, and East Point, referred to as the "Tri-Cities". From the Tri-Cities to the southern border of the county is a rural area known as "South County."

Fulton County contains 35,210 enrolled students, 3,661 of them black (ten percent). In the College Park and East Point urban and suburban areas, blacks comprise a slightly higher percentage of the total school population, about fifteen percent. For the school year 1970-71, the school board will operate fifty-four elementary schools and seventeen high schools. Currently, 1563 classroom teachers are in the system, 219 of them

1. We have expedited the appeal of this school case under Rule 2, Fed.R.App.P.

black (fourteen percent). Thirty-one (thirteen percent) of the 245 nonteaching staff are black. The school system generally provides transporation only in the rural areas, and only if the distance travelled exceeds 1.5 miles. Students in urban and suburban areas receive a special discount on the Atlanta Transit Company's buses.

The Fulton County system enjoys the distinction of having until now avoided litigating in this Court. Indeed, the board's desegregation policies were not attacked in federal court until this complaint was filed July 14, 1969. This situation appears to have been a consequence of Fulton County's attempt to maintain voluntary compliance with HEW guidelines.[2] But in July 1969, the plaintiffs filed this suit to secure the desegregation of ten remaining black schools in the county. At a hearing July 30, the district court observed that North County was desegregated and was not in issue. But the south part, the court concluded, was still a dual system. It ordered additional faculty integration and an official encouragement of black student transfers from majority black schools. In light of the late filing of the complaint, however, and the substantial plans already undertaken by the school board, the court on August 1 allowed the board to maintain nine all-black schools for 1969–70 and close only one, the Eva Thomas School. It tentatively approved the board's plan for 1970–71 which, based on new construction and the establishment of geographic zones throughout the county, would leave

2. According to the School Superintendent, Fulton County assigned pupils on the basis of dual attendance zones before Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, one for each race. Early in 1954, however, *before Brown was decided*, the school system instituted a transfer plan allowing students to transfer on the basis of objective criteria without regard to race. Apparently integration decisions had little further effect until 1964, when the Fulton County Board decided to adopt a *voluntary desegregation plan in cooperation with HEW, the first Georgia Board of Education so to decide.* In February 1965, the Board adopted what was basically a freedom-of-choice plan, providing for the desegregation of two grades per year beginning in September 1965. All grades were to be desegregated by 1970. In May 1965, after HEW issued revised guidelines, the Board adopted a second desegregation plan, *probably the first Georgia desegregation plan to be accepted by HEW*. This plan modified the first by accelerating desegregation to the rate of four grades per year, all to be desegregated by 1967. In September 1965, only thirteen black students attended formerly all-white schools. But all faculty and staff meetings and in-service programs of education were desegregated.

In April 1966, the Board adopted its third plan, modifying the earlier two to achieve desegregation of all grades by September 1966. In September, 164 black students attended formerly all-white schools, and six teachers were assigned to schools where their race was in a minority. In 1967, HEW approved a fourth plan adopted by the Board, a terminal plan to eliminate all traces of the former dual attendance zones. According to the Superintendent, *this terminal plan, the first of its kind, served as a model for many other systems and secured special commendation from HEW.* The Board closed two all-black schools in the northern part of the county, zoned all schools in that area, and placed every black student in the northern part in a formerly all-white school. In the southern part, the Board zoned geographically four high schools and twelve elementary schools. It assigned 490 pupils and fifty-nine teachers across racial lines. Closing of two more black schools and new school construction were contemplated.

In April 1969, the Board adopted a fifth plan, later amended at HEW's request. This plan contemplated the closing of the all-black Eva Thomas High School, transferring its students by attendance zones to other schools. The plan for the 1969–70 school year was geographic zoning for all twenty-three schools in the northern part of the county and for thirty-three in the southern part. Thirteen (four high schools and nine elementary) would remain unzoned and operate on freedom of choice pending completion of new construction and the working out of effective geographic zones. The system would then have 920 black students enrolled in formerly all-white schools, and new construction in 1970 would have raised the number to about 1500.

only five all-black schools. But the court ordered that plans for "total and terminal desegregation" of those five schools at the beginning of the 1970–71 school year be submitted by both plaintiffs and defendants by October 1, 1969. The court also requested and received extensive assistance from HEW.

This Court denied the plaintiffs' motion for summary reversal September 4, 1969, and the plaintiffs subsequently withdrew their appeal after an agreement was reached not to close Eva Thomas School. (Closure of Eva Thomas a year in advance of the comprehensive desegregation plan had provoked significant community opposition.)[3] January 8, 1970, the plaintiffs requested immediate relief in light of Alexander v. Holmes County Board of Education, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19, and Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477. The district court denied that request March 31 on the grounds that the plaintiffs had acquiesced in the postponement of final disestablishment for one more year[4] and that it would be an intolerable burden at that point to require immediate integration.

The district court entered its final order April 29, 1970. It found at that time that the areas of disagreement between the school board and the plaintiffs had narrowed considerably. Except for the ten schools, geographic zoning and new construction had completely desegregated the Fulton County system, and the plaintiffs objected to no part of it. Out of fifty-two elementary and seventeen high schools operated in 1969–70, only these ten (seven elementary and three high) schools had a black majority. But these ten schools enrolled 3,006 black children, approximately eighty-two percent of the black students in the system. New construction would completely desegregate two of the elementary schools and one high school by the fall of 1970, thereby reducing to fifty-nine percent the number of black students attending majority-black schools. The remaining five elementary schools and two high schools were in racially impacted urban areas.

Presented to the district court were a geographic zoning plan from the Board of Education, an alternate zoning proposal from HEW, plaintiffs' plan to pair schools to serve a common geographic area, a similar HEW proposal, and a Board of Education "course sharing plan" to be operated in conjunction with its zoning proposal. The district court constructed an amalgam. It ordered the pairing of each of the two high schools with other schools. This action completely desegrated the Fulton County secondary system. (The court noted that the Board of Education, if its course sharing plan coupled with zoning were to be found insufficient, agreed with the plaintiffs that pairing was the best solution. The parties differed only on which grades the Eva Thomas School should house.) The court further observed that the pairing would tend to stabilize residential patterns and discourage resegregation. Neither the Board nor the plaintiffs now raise any objection to Fulton County's secondary system.

3. In permitting the Eva Thomas School to continue another year as an all-black school, the district court observed that it did not necessarily agree that Eva Thomas could not be opened on a desegregated basis. The court did not wish to impose its will on the parties, however, and assumed that the plaintiffs truly represented the class of black students. Since the parties had agreed that "the task of desegregation would be facilitated if done as part of a comprehensive plan, rather than piecemeal", the district court permitted the Eva Thomas School to reopen as an all-black school. The court restated its earlier order that "[t]here will be a total disestablishment of the dual Fulton County School System beginning in September of the 1970–71 school year. This means total desegregation. Accordingly, this order does not signify a dilution of or withdrawal from the ultimate goal of total disestablishment".

4. See note 3 supra.

The elementary schools, however, the district court ordered zoned throughout the county. It observed that the plaintiffs recommended pairing for the resulting five majority-black schools as well, but rejected the proposal "as applied to elementary school children", concluding that "each child should attend the school nearest his home, rather than travelling past it to another school, unless compelling circumstances require otherwise". The court found that under the pairing proposal, travel distances would increase two and three times. Accordingly, it ordered a "[s]trict geographic zoning without regard to traffic conditions as provided in the *Orange County* case", that is, zones "based on distances measured along available routes of transportation rather than straight line distances". The result for the five elementary schools in question was as follows:

| School | Black | White | Capacity | Percentage Black |
|--------|-------|-------|----------|------------------|
| Avery (in College Park) | 179 | 79 | 270 | 69% |
| Palmetto (in Palmetto) | 132 | 20 | 390 | 87% |
| East Point (in East Point) | 409 | 54 | 720 | 88% |
| Quillian (in East Point) | 242 | 4 | 360 | 98% |
| Beavers (in College Park) | 399 | 0 | 600 | 100% |

It is from this portion of the order that the plaintiffs appeal. They apparently are satisfied with the Board's performance in North County which is virtually all-white and in the rest of South County where zoning and new construction has solved many of the problems.

The Fulton County system has reduced to eighteen percent the number of black students attending virtually all-black schools (Beavers and Quillian). Every black student at some point in his school career will be exposed to complete desegregation: no high school is less than seventy percent white. The plaintiffs ask us to improve this record by ordering their pairing plan for these five elementary schools—the only majority black schools in the system—that the district court rejected. The net gain, however, seems problematic. Currently, Longino is eight percent black, Marion Smith, sixteen percent black, and Riley, twenty percent black. The plaintiffs' plan would transform these three schools into varying degrees of imbalance—Longino, sixty-one percent black;[5] Marion Smith, fifty-five percent black; and Riley, forty-four percent black. Their respective counterparts, Beavers, Quillian, and Palmetto, would "improve" to those percentages. The plaintiffs express a fear of resegregation under the current plan in a school such as Palmetto, but the evidence indicates that their plan does not significantly allay that danger and may simply extend it to more schools.

As in so many other cases, these majority-black and all-black schools are the product of residential segregation and, historically, the location of schools to serve a segregated community. The district court here has demonstrated recognition of this problem. Its dissatisfaction with these racial concentrations appears from the order of August 1, 1969, that plans be filed by October 1 to desegregate these schools. But none of the proposed solutions was entirely satisfactory. The pairing proposals of HEW and the plaintiffs would produce longer walking distances and busing for these elementary school children. Although two schools would cease to be all-white and two schools would cease to be all-black, significant imbalances

5. If an all-white school, S. R. Young, were added as a third to this pair, the percentages would be thirty-nine percent black, sixty-one percent white.

would remain or be created. The zoning proposals, on the other hand, produced insufficient desegregation. The record indicates that the Tri-Cities area in particular had long been recognized by both HEW and the School Board as a difficult knot to untie during the voluntary compliance period.

In this context, the district court concluded that in the long run the most productive solution would be adoption of strict proximity zoning as in Ellis v. Board of Public Instruction of Orange County, 5 Cir. 1970, 423 F.2d 203. Although two all-black (Beavers and Quillian), three majority-black, and several all-white schools would remain, this plan would secure the value of assigning young children to nearby schools and, at the same time, *offer hope of change.* For example,

> the northern border of the Beavers geographic zone lines in an area in which extensive urban renewal is taking place. Upon completion of Brenningham Street, shown as proposed upon Board of Education maps, the character of the geographic zone will change and then some white students will be nearer to the Beavers school than to the adjacent school. There are presently no white children nearer the Beavers school than another school by the existing streets. Upon the completion of Brenningham Street, however, this situation will be changed and the geographic proximity zone must be redrawn to reflect the change. To a great extent, it is in the nondiscriminatory future use of the geographic proximity zones that the truly unitary nature of the school system will be found.

District Court Order of April 29, 1970. In addition, enforcement of fair housing legislation under Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189, and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. will contribute to integration of these zones. Furthermore, the district court ordered the school board to plan all future "school construction,

school consolidation, and site selection (including the location of any temporary classrooms)" to "prevent the recurrence of the dual school structure". It is this sort of planning that has already remedied some of Fulton County's desegregation problems.

We conclude that we should defer in this case to the judgment exercised by the district court. In light of what has already been accomplished, what will be accomplished under the plan, and its long range prospects, we are satisfied that the district court has the Fulton County school situation well in hand. "The plaintiffs are expressing displeasure with certain aspects of the plan, but in our view they cannot point to any basic flaw in the plan's overall effectiveness. On the contrary, our examination of the record indicates that the plan adopted by the court below is in accord with the mandates of the Supreme Court and this court and is a workable, viable plan to disestablish the dual school system". Carr v. Montgomery County Board of Education, 5 Cir. 1970, 429 F.2d 382. We therefore do not adopt the plaintiffs' pairing proposals or their zoning variances. We have observed in the record a sensitivity on the part of the district court to the law's requirements regarding school desegregation. Moreover, the School Board seems to have compiled a record of good faith in attempting to comply with the law, first through voluntary compliance with HEW, and now through cooperation with the district court. We expect that the district court will continue to give the desegregation process in Fulton County its scrutiny and that the School Board will continue its efforts to meet the law's demands.

We believe, however, that the district court and the parties may have overlooked one more available remedy. With its original zoning proposal relating both to the high schools and the elementary schools, the School Board coupled a plan for what we have elsewhere called "part-time desegregation". United States v. Board of Education of Bald-

win County, 5 Cir. 1970, 423 F.2d 1013; Bivins v. Bibb County Board of Education, 5 Cir. 1970, 424 F.2d 97. In Fulton County,

> [t]his plan would involve the joint sharing of subject matter by the students of racially impacted schools and adjacent schools, using them alternately as teaching centers. Transportation would be furnished by the school board to the children, who would move from one school to another during the day, but for a limited portion of the day.[6] In the lower grades, the shared matter generally was to be a humanities curriculum based on the Spanish language, while in the upper grades it relied on practical courses, such as driver education, distributive education and diversified cooperative training.

District Court Order of April 29, 1970.[7] We believe the district court was correct in ruling that this program along with the School Board's proposed zones would have been insufficient to disestablish the dual system. But that need not be the end of such a proposal. We have applauded such plans as "bold and imaginative innovations" to encourage voluntary desegregation. Bivins v. Bibb County Board of Education, 424 F.2d at 98. They seem particularly adapted to a situation like that in Fulton County, where residential patterns in some instances present an obstacle to integrated schools. Of course they are not a substitute for disestablishing a dual system, but they may be a beneficial adjunct. Fulton County has two all-black, three majority-black, and several all-white schools which could benefit from such a program. We do not understand the Board's proposal to have been limited solely to the high schools. But the record is not well developed on the working of the course-sharing proposals. We therefore remand this issue to the supervision of the district court.

6. According to the school board's brief, school buses are not in use during the day, and thus would be available for such a project.

7. The plan, as originally submitted by the school board November 14, 1969, was as follows:

    *Subject Matter Sharing*
    1. *Elementary Schools.*
    The following elementary schools will participate in subject-matter sharing in connection with the Spanish Language Program and associated subjects:
        *College Park Complex*
    Beavers [one hundred percent black], Avery [sixty-nine percent black], Longino [ninety-two percent white] and Newton Estates [one hundred percent white] Schools will jointly share subject matter, in teaching centers located alternately in Beavers and Longino Schools.
        *East Point Complex*
    East Point [eighty-eight percent black], Quillian [ninety-eight percent black], Harris Street [one hundred percent white] and Parklane [one hundred percent white] Schools will jointly share subject matter, in teaching centers located alternately in East Point and Harris Street Schools.
        *Palmetto Complex*
    Palmetto [eighty-seven percent black] and Charles Riley [twenty percent black] will jointly share subject matter, with teaching centers located alternately in each school.

    All students taking the Spanish Language Program in each complex will be assigned and furnished transportation, during the school day, to the teaching center in the complex, for a portion of the school day. In the teaching center, the students will be assigned to small classes on a non-racial basis, for the Spanish Language Program and various associated subjects. At the conclusion of this instruction, students will be furnished transportation back to their home schools.

    The Spanish Language Program is an innovative program which has been conducted on an experimental basis in the past in several Fulton County schools and is being introduced into some of the above-named schools for the first time in the 1970–71 school year. Because such a program must begin in the third or fourth grade, it will, during the first year, involve only those grades, and as the students in those grades are promoted, it will ultimately involve grades three through seven in all of the above-named elementary schools.

There are some other matters to be resolved on remand. The plaintiffs suggest in their brief that a slight variance in strict proximity zoning may have occurred with regard to the S.R. Young Elementary School zone. The defendants respond that the plaintiffs had agreed to the zone at a hearing, and suggest that probably no students are involved. Ellis v. Orange County Board of Education, however, allows no variances from the standard of strict proximity zoning where it is used. We direct the district court to determine whether there is a variance in the zone and, if so, to correct it.

■■ Three other modifications are necessary to fulfill our *Singleton* mandate. Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211 (en banc), rev'd in part sub nom. Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (per curiam) (reversal limited to the issue of *timing* of student desegregation). These are matters evidently not raised below, but which our latest decisions have required. (1) The district court's majority-to-minority transfer provision must be modified to provide that (a) all transferring students shall be given transportation if they desire it;[8] (b) transferees must be given priority for space. Carr v. Montgomery County Board of Education, 429 F.2d 382 at 386. (2) The district court shall establish a bi-racial committee to serve in an advisory capacity as outlined in Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1970, 430 F. 2d 883, No. 29,332; Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 426 F.2d 1364; Ellis v. Orange County Board of Education, 423 F.2d at 206.[9] (3) We do not find in the district court's order of April 29, 1970, any provision regarding continued desegrega-

tion of extracurricular activities. The parties seem to assume that the order did so direct, and we direct the district court to amend its order to include such a provision.

The judgment is affirmed in part and remanded for further proceedings consistent with this opinion.

(whether this was final or tentative is unclear) to the "creation of a biracial advisory council to assist the Board and its staff in implementing its desegregation plan."

---

8. Except urban and suburban areas where public transportation is available and it is the policy of the State or local School Board not to furnish transportation.

9. Defendants' exhibit 8 reveals that May 1, 1969, the Board agreed with HEW