**Vivian CALHOUN et al., Plaintiffs,**

v.

**Ed S. COOK et al., Defendants.**

**Civ. A. No. 6298.**

United States District Court,
N. D. Georgia.

Atlanta Division.

July 28, 1971.

Howard Moore, Atlanta, Ga., for plaintiffs.

A. C. Latimer, Atlanta, Ga., for defendants.

Before SMITH and HENDERSON, District Judges.

PER CURIAM.

This case is on remand from the Fifth Circuit, 443 F.2d 1174, with directions to require implementation of a pupil assignment plan in compliance with the principles of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 91 S.Ct. 1267, 28 L.Ed.2d 554 (April 20, 1971). Specifically, it directs only two changes: (1) The provision for majority-to-minority transfer with transportation and space being guaranteed under the option and (2) The filing of semi-annual

reports. United States v. Hinds County School Board, 433 F.2d 611 (5th Cir. 1970). After hearing on remand the court finds the following:

## HISTORY

This case is now in its thirteenth year before this court, having been filed in 1958. Atlanta in 1961–62 was one of the first major southern cities officially abandoning the dual school system. In its court experience, the original desegregation order was one of the few unappealed and assented to. Periodically as each new specific to Brown v. Topeka[1] was belatedly developed by the higher courts, the School Board has been returned to court and given new directions under such landmark cases as *Jefferson*,[2] *Green*,[3] *Singleton*,[4] *Montgomery County*,[5] and *Orange County*.[6] Each has been accepted and promptly implemented. In the interim, the system voluntarily accelerated from the early concept of grade-by-grade annual integration to system-wide integration; it voluntarily and studiously located new schools and rezoned so as to maximize integration; it voluntarily liberalized its pupil-transfer plan; and in various ways increased responsibility for its black teaching personnel, principals, and area superintendents. Through court order, it has advanced from the initial requirement of two teachers of opposite race to each school to a computerized mathematical distribution of its faculty by race throughout the city; and from historical and traditional attendance zones to a court-supervised optimum *Orange County* plan. No one has successfully challenged the good faith of its elected Board of Education, the appointed Superintendent, Dr. John W. Letson, or of its administrative personnel throughout this uncertain decade. Its efforts were early described as "commendable" by the Supreme Court. Calhoun v. Latimer, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288 (1964). Each change has produced convulsive implosions within the system and what has now become the annual agony of Atlanta has caused significant change in the character of the system, both physically and psychologically.

When this suit began, Atlanta had a pupil ratio of 70% white and 30% black and a predominantly white faculty; today, its racial complexion has reversed to 70% black and 30% white and its 4,800 teachers are 60% black and 40% white. From an enrollment of 115,000 students it has dropped to 100,000 in the school year 1970–71, during which it lost 7,000 whites and gained 1,000 blacks. The system itself covers an area approximately 16 miles long and 14 miles wide lying in Fulton and a portion of DeKalb counties. The Atlanta City School System is a so-called "independent system" in that it is separately organized and operated from the county systems, each receiving direct grants from the state, supplemented by local tax funds. It is one of the 31 remaining independent city systems within the state. As such, it receives no state funds for transportation. It has never transported students, owns no busses, and there is no school "bussing" available. Based on information furnished by each principal as to location and times, the private Atlanta Transit System arranges routes to accommodate students at reduced fares provided by each student individually.

1. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

2. United States v. Jefferson County Board of Education, 380 F.2d 385 (5th Cir. 1967).

3. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

4. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1970).

5. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

6. Ellis v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203 (5th Cir. 1970).

The system presently maintains 123 elementary/primary schools and 29 secondary schools, with two units to be opened this coming year.

The white students remaining are concentrated at the extreme northern and southern ends of the district, while the vast middle is a broad belt of industry and high-density solid black housing. The line between these areas is steadily creeping towards the ends, with increased black housing and diminished white housing. Since 1961, it has annually achieved substantial temporary integration by the establishment or construction of "line schools". However, 34 of those schools have gone from all-white to 90% or more black during the period. This "tipping process" is so rapid that it sometimes occurs by the time a facility deliberately located to increase integration can be completed and occupied. Seldom does it last longer than two years. Since official desegregation in 1961, 24 new schools have been constructed, several of which have been especially built to serve federal housing developments in the inner city. Others were appropriated for such purposes. In spite of official laws and directives to the contrary, the bulk of such developments have been operated as all-black since inception. As a natural consequence, 29 schools provided for such "controlled situations" are substantially black. Enforcement of fair housing legislation under Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L. Ed.2d 1189 (1968), and Title VIII of the Civil Rights Act of 1968 will automatically integrate these zones. See Hightower v. West, 430 F.2d 552 at 556 (5th Cir. 1970).

The cause of such frustrating results lies in factors completely beyond the control of school authorities. Segregated housing, whether impelled by school changes or not, remains the unconquerable foe of the racial ideal of integrated public schools in the cities. The white flight to the suburbs and private schools continues. As far back as 1967, in an offshoot of this case involving the proposed construction of an all-black school in the heart of the black belt, the problem was accurately characterized by plaintiffs' witnesses and the court as *de facto* rather than *de jure*. Griggs v. Cook, D.C., 272 F.Supp. 163, aff'd 384 F.2d 705 (5th Cir. 1967). The problem is no longer how to achieve integration, but how to prevent resegregation. Only last year, the parties and Judge Hooper for this court exhaustingly investigated possible remedies for over seven weeks of trial, culminating in the orders involved in this appeal and remand. Some of the fruits of those "best efforts" have already slightly soured in the face of evolutional *de facto* changes. Through it all, the Atlanta system has maintained a traditional position of leadership in the public schools. It remains at the top of the state in pay scale, curriculum development, and innovative efforts in quality education.

## THE PRESENT SITUATION

In this litigation, the longtime standard of measurement has been the classification of schools in excess of 90%–10% enrollment by race as "integrated". Presently, 38 elementary schools and 13 secondary schools meet this test in that they have integration in excess of 10% (many at 50–50) of the minority race at such schools. Of the remainder of 101, all but 46 have either completely resegregated, serve special controlled housing situations, or have been built since official desegregation as previously discussed. Of some 46 schools in neither category, the information furnished the court reveals substantially the following:

24 have integration of less than 10% (ranging from 1%–7% black and 1%–5% white);

7 have only token integration (less than 10 students of the opposite race, ranging from 1–4 blacks and 3–9 whites);

15 are either all-black or all-white.

The closest schools with a majority of the opposite race are located as follows: [7]

| Less than ¾ mile | — | 1 |
| ¾ mile to 1½ miles | — | 5 |
| 1½ miles to 2 miles | — | 11 |
| 2 miles to 8½ miles | — | 29 |

Last year, 1140 students took advantage of the unlimited transfer option in effect.[8] There is, in fact, no serious problem of overcrowding at any facility. Annual zone changes and excellent modern portable classrooms are used to take care of increasing enrollments in either white or black schools. There are, proportionately, as many vacant classrooms at black schools as at white. The court is convinced that no device of packing is being used to preserve segregation. To the contrary, crowding at one school has been used to increase integration at another school. The Board assures the court there will be no problem of overcrowding at any school during 1971–72.

When the remand issued, the Board promptly agreed to the specifics required therein by formulating plans with the Atlanta Transit System to afford transportation by direct grants to the students taking advantage of the majority-to-minority transfer option. Prior thereto and following the issuance of *Swann*, it formed administrative task forces to study the possibilities of increasing integration by pairing, rezoning again, etc. All of those efforts have been reviewed by the court and representatives of the plaintiffs. Pairing or additional zone changes along the line either produce substantial hardship increases in travel time for the children involved or seriously imperil existing integration at one of the schools involved. In either event, the end result at best would accomplish only a temporary change soon to be wiped out in the historical pattern already established.

With the exception of an innovation in the transfer system, no single measure appears hopeful under the circumstances. There is evidence in the prior record that Atlanta has encouraged maximum majority-to-minority transfers on an individual basis. The court reasons that if such transfers could be effected on a bus-load basis, the prospects can be enhanced. The Atlanta Transit System is in dire straits itself. However, it has agreed to allow the Board to utilize the same total number of busses previously employed on an individual pick-up route basis for "group transfers". Thus, if a bus-load group of students in one area opt for a transfer to a particular school of the opposite race in another area, they can be transported at the same time in the same bus rather than individually along with the general public. The attached order so provides.

Additionally, the Board has agreed to make special efforts in the black area to encourage such group transfers through its area superintendents and other personnel stationed there. Already, it has given wide-publicity to the new transfer option through local newspapers, television, and radio. Over 100,000 bulletins have been placed in the neighborhood schools and a teacher is on duty to explain the plan to all interested parties. A central information center with a publicized telephone number has been established to impart the details to anyone inquiring. Each pupil may readily apply for the new transfer at the school he last attended on a quarterly basis on or before two days before the quarter opening.

### CONCLUSIONS

Other than the above, it is apparent that the only device which could effect

---

7. These distances are calculated in straight lines without regard to traffic patterns, transportation barriers, etc. In many instances, there is an intervening interstate highway, railroad, or similar artificial barrier.

8. Under the old freedom-of-choice provisions, an unusually large number of blacks by-passed closer white and black schools to attend a "prestige" black school; and white students by-passed closer white and negro schools to attend a "prestige" white school.

any significant change in mass-bussing in an endeavor to achieve a 30%–70% ratio throughout the system. As seen, distances alone would require 40 minutes or more for each child transported and all of this would have to be achieved by a system which has no busses, no drivers, and no funds with which to acquire and operate them. The pairing of non-contiguous attendance zones is, under urban circumstances where a half-mile for a school child is a long distance to walk, but another term for bussing. The court has considered the possibility of requiring the transportation of black students from the center to the white ends. This move is opposed by a large group of blacks except on a voluntary basis as described. On the facts alone, the court concludes that wholesale bussing is neither "reasonable, feasible, or workable."

Of paramount significance, however, is the obvious result. Atlanta now stands on the brink of becoming an all-black city. A fruit-basket turnover through bussing to create a 30% white–70% black uniformity throughout the system would unquestionably cause such a result in a few months time. Intelligent black and white leadership in the community realizes and fears it. Responsible citizens both in and out of the school system are deeply concerned with preservation of the biracial identity of the city. Without it, the ultimate goal of equality in all its aspects is doomed and Atlanta's position of leadership is severely threatened.

The Atlanta School Board is made up of ten members, three of whom are black. Its chairman is Dr. Benjamin Mays, a respected black educator and civil rights leader. The Board deems it unrealistic to go further than stated and unwise to do so. The Biracial Committee appointed by this court is composed of ten outstanding civic and business leaders, five of each race. Its Chairman is Mr. Lyndon Wade, the black Executive Secretary of the Urban League. A majority of 9 [8A] of its members have fur-

nished the court with a resolution praising the Board's efforts and recommending no further action. Short of mass bussing, the plaintiffs whose counsel and advisors have vast experience in such matters can offer no other alternatives. The Department of Health, Education and Welfare has long ago approved the present plans.

The remedy of ·mass bussing under these circumstances is rejected. Nor is it deemed required under *Swann.* "An objection to transportation of students may have validity when the time or distance of travel is so great as to risk either the health of the children or significantly impinge on the educational process." [*Swann* at Part V(4)].

The time and distance which would be involved is impractical, particularly for children in the primary and elementary grades. If the premise of *Brown* is correct and education in an all-black system is injurious, then certainly the results here would impinge the educational process for the children remaining. At least now there is complete integration administratively and substantial integration in pupil assignment. In a similar situation (Memphis), the Sixth Circuit in its post-*Swann* remand, indicated that the "extensive transportation of pupils to schools all over the city, regardless of distances involved, in order to establish a fixed ratio in each school" is not required; and seemingly recommends that the trial court review all of those other devices already considered in Atlanta. Northcross v. Board of Education, 444 F.2d 1179 (6th Cir., June 7, 1971).

*Swann* holds that once *de jure* status is removed that a school district is not required to reintegrate continually due to *de facto* changes. "Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the

---

**8A.** The tenth member was out of the city for an extended absence.

system." [*Swann*, Part VI]. On this basis, there is considerable merit to the position that this case ought to be dismissed forthwith. Atlanta's *de jure* status has long since been removed by Board action and by successive court decrees. Its present problems are entirely *de facto*. There is absolutely no evidence of any affirmative action by the board to increase segregation. *Cf.* Hobson v. Hansen, 320 F.Supp. 720 (D.C.D.1970). To the contrary, all official action for many years has been to promote integration. It appears to be a unitary system "within which no person is to be effectively excluded from any school because of race or color." Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). On such basis, Atlanta is entitled to a dismissal.

However, should *Swann* be considered as a starting point for such a goal, the present facts qualify. In essence, *Swann* holds that the essentials of any unitary system are the elimination of invidious racial distinctions in regard to (1) *transportation*, (2) *faculty and supporting personnel*, (3) *extracurricular activities*, (4) *construction and site selection*, and the presence of an (5) *optional majority-to-minority transfer provision*. To the extent that they apply, Atlanta has had such essentials for some time. With this order, the payment of public transportation and space guarantee has been added to the transfer provision. On *pupil assignment*, the Court, sitting in equity, may utilize any number of devices to achieve a "realistic and workable" plan for the district. All of the devices named, with the exception of mass bussing, have been considered by the Board and the Court and optimum results obtained. Insofar as one-race schools are concerned, the Board has satisfied its burden of showing that "their racial composition is not the result of present or past discriminatory action on their part." [*Swann*, Part V(2)].[9] Accordingly, upon implementation of the attached order, the system will be judicially declared unitary and a dismissal will be directed on January 1, 1972, the court retaining the inherent jurisdiction to deal with future problems.[10] "But in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary." [*Swann*, Part VI].

## COMMENT

Looking ahead, the court is compelled to note that the critical point for public education in the City of Atlanta and its environs has been reached. The situation calls for a sweeping examination of its relationship to housing, planning, finances, rapid transit and all the other external factors which vitally affect its role in the community. Apparently, no serious effort has been expended on the question of consolidation of the Atlanta system with the Fulton County system. In terms of efficiency, taxes, and quality education, such consolidations normally produce long-range improvements. In terms of the current problem, such consolidation might well produce partial, even though not perfect, solutions. Certainly for many reasons connected and unconnected with this case, this one aspect ought to be studied without delay. In any such investigation, the proper

9. As seen, on a school-by-school basis there is existing integration of some kind or there is a purely *de facto* situation occurring since official desegregation in all but 15 all-black or all-white schools, or less than 10% of the total facilities in operation.

10. In this respect, it should be made clear that for the present, the *Singleton*-type faculty assignment ordered by the court on March 20, 1970, calls for an annual adjustment. See Carter v. West Feliciana Parish School Board, 432 F.2d 875 (5th Cir. 1970). Implicit in the attached order is the admonition that it be so administered until further direction is received.

vehicle should be community-wide, crossing lines of industry, government, and transportation as well as education. While the School Board should certainly participate, it cannot function successfully alone. A special Mayor's Committee of both races might be appropriate. The existing Biracial Committee might well be expanded to 20–30 members to undertake such a task. If so, the court would gladly entertain a motion by any party or the committee itself to add sufficient members to represent the other community aspects involved. Short of such critical reevaluation, the Atlanta system faces a difficult task in merely "hanging on" to its present position, awaiting the uncertain reversal of white flight from its limits.

It is so ordered.