Frank V. THOMPSON et al., Appellants,

v.

The SCHOOL BOARD OF the CITY OF NEWPORT NEWS, VIRGINIA, et al., Appellees.

Frank V. THOMPSON et al., Appellees,

v.

The SCHOOL BOARD OF the CITY OF NEWPORT NEWS, VIRGINIA, et al., Appellants.

Nos. 71-2032, 71-2033.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1972.

Decided Aug. 2, 1972.

Henry L. Marsh, III, Richmond, Va. (S. W. Tucker, James W. Benton, Jr., and Hill, Tucker & Marsh, Richmond, Va., and Philip S. Walker, Newport News, Va., Jack Greenberg, James M. Nabrit, III, and Norman Chachkin, New York City, on the brief) for Frank V. Thompson.

Robert V. Beale, Newport News, Va. (Bateman, West & Beale, Newport News, Va., and Panos A. Yeapanis, City Atty., for the City of Newport News, Virginia, on the brief), for School Board of the City of Newport News.

Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL and FIELD, Circuit Judges, sitting en banc.

DONALD RUSSELL, Circuit Judge:

From an order of the District Court in these school desegregation cases, both plaintiffs and defendants have appealed. The appeal of the plaintiffs will be first considered.

I.

Plaintiffs assail the manner in which the plan approved by the District Court would assign elementary pupils in the school system. Under the plan, pupils in grades 1 and 2 are to attend neighborhood elementary schools; pupils in grades 3, 4 and 5, as well as pupils in grades 6 and 7 are to be assigned to paired schools. For the first paired group (i. e., pupils in grades 3, 4 and 5), the mother schools to which all living in the paired neighborhoods are assigned, are schools formerly identifiable as white in a white neighborhood and, in turn, all pupils in grades 6 and 7 would be assigned to formerly identifiable black schools. The plaintiffs took exception in the District Court and on oral argument in this Court to both the assignments of grades 1 and 2 to neighborhood schools and grades 3, 4 and 5 to formerly identifiable white schools. In their statements of issues on appeal, as set forth in their written brief filed with this Court, however, the plaintiffs did not object to the assignments of grades 3, 4 and 5 and confined the issues, as set forth in their brief, to the assignments of grades 1 and 2 to neighborhood schools. Since there was some reference to the issue relating to the assignments of 3, 4 and 5 grades in oral argument it would seem appropriate to touch briefly on this issue before passing on to the primary issue in the case.

It should be observed at the outset that, as a result of the pairings of grades 3 through 7, the proportion of black students in these grades in the various schools, while varying from approximately 15 to 50 per cent, will approximate, it is estimated, 65 per cent white and 35 per cent black in most instances. To achieve this result will require extensive busing. It was argued before us that the assignments made to paired schools for the 3rd, 4th and 5th grades, and the substantial amount of busing that followed from such assign-

ments placed an undue and discriminatory burden on black students. The basis of this argument is that the white school child would attend for his first five school years a school formerly identified as a white school and located in a white neighborhood, whereas the black child would be in a school located in a black neighborhood only in his first two grades and in his 6th and 7th grades.

The situation in the respective pairings in this case is not appreciably different, however, from that involved in Clark v. Board of Education of Little Rock School Dist. (8th Cir. 1971) 449 F.2d 493, where the pairings under the plan of desegregation required all 8th and 9th grade pupils to attend school in four junior high school centers, three of which had been previously identifiably black schools and all 6th and 7th grade pupils were required to attend schools in facilities previously identifiably white. In sustaining the plan, the Court said (p. 496):

> "While we agree that the burden of integration must be shared by blacks and whites, we do not agree that the sharing of the burden at the secondary level, when considered as a whole, is so unequal as to require upsetting the District Court's plan."

To the same effect is our own case of Allen v. Asheville City Board of Education (4th Cir. 1970) 434 F.2d 902, where it was stated, in sustaining a plan against a similar claim of unfair burden (p. 907):

> "If achieving integration by free bus transportation for reasonable distances must now be characterized as a 'burden' and if we also assume, without deciding, that this burden must be equally shared between the races, the school board's plan is nevertheless val-

id. The worst that can be said of the plan is that in grades 1 through 5 the burden falls disproportionately on black children, whereas in grades 6 through 12 it falls disproportionately upon white children."

See, also, Hart v. County School Board of Arlington Co., Virginia (D.C.Va. 1971) 329 F.Supp. 953, aff. 459 F.2d 981 (4th Cir.), where a like claim that, as a result of the assignment of elementary pupils among schools under the proposed plan "all the burdens and inconveniences of desegregation are imposed entirely on the black children", was disallowed.[1] (p. 955)

It must be conceded that, unlike the situation in *Clark* and *Allen*, there is here an unequal division between the school years spent by elementary students in identifiably black and indentifiably white schools. Such inequality, however, is unavoidable, since there is an unequal number of elementary grades (i. e., seven). Of the two groupings, one had of necessity to include three grades and the other two grades. There was some obligation on the school board to offer satisfactory reasons for the grouping it made, since the white elementary students had one more year in elementary identifiably white schools, than black elementary students had in identifiably black schools. Since the cause is to be remanded, the District Court should inquire into and make findings of fact on whether the grade groupings were based on non-discriminatory grounds. See Haney v. County Board of Education of Sevier County (8th Cir. 1970) 429 F.2d 364, 372.[1a]

The most difficult issue posed by the plaintiffs relates to the assignment of pupils in grades 1 and 2. The District Court gave as its primary reason for ap-

1. Chief Justice Burger refused to stay implementation of this plan as approved by the District Court. The New York Times, September 5, 1971, at p. 20, col. 1.

1a. In determining the fairness of the grouping adopted under these circumstances where some inconvenience is inevitable, the school district was not required to disregard comparative expenses involved in the various available groupings, as well as the comparative numbers required for cross-busing under the feasible methods of groupings.

proving neighborhood schools for the 1st and 2nd grades

"* * * that the bussing facilities, assuming the adoption of the elementary plan as submitted on August 6, 1971, will be taxed to the limit. If we are to likewise move the first and second grades, that would require additional bussing facilities or a staggering of the opening of the schools, which is most undesirable but which has been ordered in other areas, especially where the school does not own and operate its bus system; but, lastly, the reason that I think it is important to keep children in the first and second grades in the neighborhood area is that while it is not supported by any testimony in this case, I am old-fashioned enough to think that it is vitally important that a child, starting his or her public education, should commence the same with some degree of happiness and satisfaction, including some degree of comfort on the part of the parent who, indirectly or directly, controls that child, and children of that age are of sufficient intelligence to hear the griping of the father and mother about the transportation of that child for the first couple of years. They will hear it again later, but the child may have matured somewhat. If you send a child to public school with a chip on the child's shoulder, in my judgment, it would adversely affect the child."

██ It is of course, axiomatic that every plan must take into consideration the unique characteristics of the school district to be served. What may be practical in one district may not be applicable in another. This was made plain in the opinion of the Court in Green v. County School Board (1968) 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716:

"There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance."[2]

Manifestly, Newport News School District presents unique problems for the development of a practical plan of desegregation. These problems arise out of its physical pattern as well as out of the geographic concentration of its racial groups. The Newport News School District is a consolidation of the old City of Newport News with the former City of Warwick (Warwick County prior to 1952), made effective in 1958. The old City of Newport News is located at the extreme southerly tip of the Virginia Peninsula. It comprises a small, concentrated area of four square miles. The City of Warwick, on the other hand, is to the northeast of the City of Newport News and contains more than sixty square miles. The consolidation created an odd-looking district, described in the record as "cigar-shaped", somewhat more than twenty-two miles in length and varying in width from seven-tenths of a mile to six miles. Not only was it unique in its geographic limits; its racial distribution was so distributed as to create to a degree two separate racial communities. Eighty per cent of the black population lives in the old City of Newport News. This concentration has developed over the years. In 1930, for instance, the population of the old City of Newport News was approximately sixty per cent white and forty per cent black. Thirty years later the proportions were exactly reversed. By 1970 the black proportions had risen to over ninety per cent. Outside of the old City of Newport News and its immediate environs, there is no substantial grouping

2. See, also: Swann v. Charlotte Mecklenburg Board of Education (1971) 402 U.S. 1, at p. 29, 91 S.Ct. 1267, 1282, 28 L. Ed.2d 554:

"Conditions in different localities will vary so widely that no rigid rules can be laid down to govern all situations." Ross v. Eckels (5th Cir. 1970) 434 F.2d 1140, 1147:

"* * * school cases are unique. Each school case must turn on its own facts."

of blacks except for a small, narrow strip running across the northwest width of the district near its center. The elementary school population of the district as a whole is roughly thirty-six per cent black and to service this population, the district maintains thirty-two elementary schools, thirteen of which are located in the old City.

The school district offered expert testimony on traffic congestion in the district, especially as it related to traffic out of or into the old City. This traffic pattern is obstructed by two major highway crossings, through which traffic passing from the old City to other areas of the district must pass. These crossings or interchanges, it was testified, are particularly crowded during the hours when there is school busing by working people going to or returning from work at the Newport News Shipbuilding and Dry Dock Company, where some twenty thousand people are daily employed. It was the contention of the school board that, as a result of the heavy volume of traffic at these intersections, there was an abnormally high accident incidence. As a consequence of this traffic arrangement, it was argued that buses could not follow a straight line but were forced to follow a more circuitous route from the old City to other points in the district.[3] It was testified, without contradiction, that travel time, varying from a minimum of forty minutes and a maximum of one hour, each way, would be required for busing black students out of the old City and white students into the old City in order to achieve a racial balancing of the district. The average distance of the busing would be 11.2 miles, one way.

The difficulties of achieving racial balance in this district as a result of distances involved and traffic problems were explained by the School Superintendent thus:

"Now, with all of the concentration in Newport News being at one end, in order for a cross-busing plan to produce results in this case it is necessary to involve all or nearly all, of the other elementary schools, and therefore it becomes a matter of busing from the extreme south east end of the city through the entire length of the city and vice versa. There are no areas scattered throughout the city of any consequence to provide this necessary mix. It must all come from one area."

*Swann*[4] recognized that there were special difficulties in achieving desegregation in urban areas such as Newport News and that "Rural areas accustomed for half a century to the consolidated school systems implemented by bus transportation could make adjustments more readily than metropolitan areas with dense and shifting population, numerous schools, congested and complex traffic patterns."[5] Changes in the metropolitan areas, sometimes unexpected and sudden, are not infrequently of such a character that they may be said to result in "neutralizing or negating remedial action before it was fully implemented".[6] Chief Justice Burger, speaking for the Court, made the specific point that, "An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the

3. *Swann* makes it plain that the point to consider in connection with busing is not so much geographic contiguity as "the critical travel time" itself, as caused by the "traffic patterns" in the District. (402 U.S. p. 29, 91 S.Ct. 1267).

It has several times been stated that in this connection distance shall be measured not by straight-line distances (or, as one court describes, "as the crow flies") but along practical and available routes of transportation. Hightower v. West (5th Cir. 1970) 430 F.2d 552, 555; Lee v. City of Troy Board of Education (5th Cir. 1970) 432 F.2d 819, 822, n. 10.

4. 402 U.S. 1, 91 S.Ct. 1267.

5. 402 U.S. at p. 14, 91 S.Ct. at p. 1275.

6. 402 U.S. at p. 14, 91 S.Ct. at p. 1275.

children[7] or significantly impinge on the educational process. * * * It hardly needs stating that the limits on time of travel will vary with many factors, but probably with none more than the age of the students."[8] In short, it seems fair from a careful reading of the opinions in both *Swann* and its companion *Davis*[9] to conclude, as the Court remarked in Northcross v. Board of Education of Memphis City Sch. (6th Cir. 1971) 444 F.2d 1179, 1183, that, as a result of the consideration just stated, those decisions are not to be read "as requiring the District Court to order the Board to provide extensive transportation of pupils to schools all over the city, regardless of distances involved, in order to establish a fixed ratio in each school". Courts may and should give consideration to the distances and ages of the students involved in determining how much busing is proper. This represents the obvious distinction between Henry v. Clarksdale Municipal Separate School District (5th Cir. 1970) 433 F.2d 387, 390–391, and Ellis v. Board of Public Instruction of Orange Co., Fla. (5th Cir. 1970) 423 F. 2d 203, 205. In the first case, the school district comprised a mere four square miles and transportation presented no problems of distance. On the other hand, in *Ellis*, the school district consisted of a large land area, divided into ninety-eight schools. In *Henry*, the Court ordered full integration; in *Ellis*, it approved a partial neighborhood plan under which there remained identifiable black schools. Moreover, the District Court may also take into consideration any traffic hazards or other complexities of transportation in approving a plan of desegregation. Thus, in *Davis*, the Court was confronted with a situation somewhat similar to that here. The district was divided by a north-south primary highway into two areas, interchange between which was difficult. As a consequence, the plan under review treated the two areas, thus divided, separately and did not, because of the traffic hazards, require cross-busing between the two. As a result, there was a substantial number of identifiable black schools. The Supreme Court sent the plan back to the District Court with instruction that "the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, *taking into account the practicalities of the situation.*" (Italics added).[10] It seems implicit from this mandate that "practicalities" do represent a factor to be weighed by the District Court in passing on a plan of desegregation; and that cross-busing is not to be automatically ordered, irrespective of all considerations of distance, time required for travel, traffic hazards, and age and maturity of students involved.

This construction of the sweep of *Swann* and *Davis* has been applied in a number of recent cases quite similar to this case. In Hightower v. West, *supra,* a plan desegregating certain schools of Fulton County (Georgia) was considered. By the terms of the plan, the secondary schools of the system were fully desegregated, so that the Court could declare that "Every black student at some point in his school career will be exposed to complete desegregation: no

---

7. The school district offered medical evidence that the extensive busing required if there were to be full integration of elementary grades in the school system would have an adverse effect on the health of the pupils. The District Court, in its opinion, stated it could not accept this "testimony in its entirety". We have accordingly not taken into account such testimony on this appeal. If there is any credible evidence along this line developed on remand, the District Court may give such consideration to it as it finds is warranted.

8. 402 U.S. at pp. 30–1, 91 S.Ct. at p. 1283.

9. Davis v. Board of School Com'rs of Mobile County (1971) 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577.

10. 402 U.S. at p. 37, 91 S.Ct. at p. 1292.

high school is less than seventy percent white".[11]  But, taking into consideration age and difficulties of transportation, the Court approved the zoning of the elementary grades in the schools involved, stating that " 'each child (in the elementary grades) should attend the school nearest his home, rather than traveling past it to another school, unless compelling circumstances require otherwise' ".[12]  Because of this treatment of the elementary grades, "two all-black * * *, three majority-black, and several all-white schools would remain" in the system.[13]

Calhoun v. Cook (D.C.Ga.1971) 332 F.Supp. 804, like *Hightower*, dealt with schools in the Atlanta area.  At the time of the suit, Atlanta had roughly divided itself into a black and white city, with the white students being concentrated at the extreme northern and southern ends, and the vast middle being a broad belt of industry and high-density solid black housing, creating a very congested traffic condition.  Even as in Newport News, residential patterns would require extensive cross-busing in order to achieve a balanced unitary school system.  In concluding against such cross-busing in all instances, the Court said that, "The time and distance which would be involved is impractical, particularly for children in the primary and elementary grades".[14]

Ross v. Eckels, *supra*, arose in connection with the desegregation of the schools of Houston, Texas.  Under the approved plan, all secondary grades were desegregated, with the result that, "Every Negro child at the high school and junior high school level will receive his education in an integrated atmosphere." [15]  But, giving consideration to all factors, the plan accepted by the Court allowed neighborhood schools for the elementary grades, except where it was found that the pairing of contiguous schools was practical.[16]

While it seems clear from this review of the authorities that, under proper circumstances, the assignment of the primary grades to neighborhood schools is not *per se* unacceptable, such assignment must rest on specific findings of fact establishing that, on account of ages of the pupils and difficulties of transportation, no other plan affording greater integration is practical.  And, where there is insufficient basis for such conclusion, zoning is impermissible.  That represented the rationale of the decision in Edwards v. Greenville Municipal Separate School Dist. (5th Cir. 1970) 431 F.2d 365, where the District Court had approved a plan providing for geographic attendance zones for the elementary grades (i. e., 1 through 6 grades).  Incidentally, such plan had the overwhelming indorsement of the school system's biracial committee.  The Circuit Court remanded the cause with direction to the District Court to consider whether, in some instances at least, pairing of schools in order to achieve a better racial balance was not feasible and remand is particularly apposite where the District Court has failed to consider any alternate plans.  In this case, the plaintiffs sought to develop proof of an alternate plan which they claimed would achieve a greater degree of integration at the elementary level than that approved by the Court.  The District Court, however, refused to consider this proposal of the plaintiffs.  Perhaps, as the District Court commented, the proposal was no more than a jumbling of figures.  But at least reasonable opportunity should have been given the plaintiffs to present in the evidence their alternative.  It was to provide just such an opportunity that Calhoun v. Cook, *supra*, on appeal, was re-

---

11. 430 F.2d at p. 555.

12. 430 F.2d at p. 555.

13. 430 F.2d at p. 556.

14. 332 F.Supp. at p. 808.

15. 434 F.2d at p. 1147, n. 9.

16. 434 F.2d at pp. 1147–1148.

manded and the District Court was "ordered to afford plaintiffs-appellants a reasonable opportunity to present and support an alternate and superior plan for the desegregation of the Atlanta school system, which plaintiffs indicated could be and was being developed." Calhoun v. Cook (5th Cir. 1971) 451 F.2d 583. This result, too, is consonant with our own decision in Adams v. School District Number 5, Orangeburg Co., S. C. (4th Cir. 1971) 444 F.2d 99, 101, to the effect:

> "If the district court approves a plan achieving less actual desegregation than would be achieved under an alternate proposed plan it shall find facts that are thought to make impracticable the achieving of a greater degree of integration, especially if there remain any schools all or predominately of one race."

 To summarize: While not concluding that the use of neighborhood assignments for grades 1 and 2 in this particular school district with its unique characteristics is *per se* invalid, the action is remanded to the District Court to consider fully any alternate plans that may be presented by the plaintiffs and others and to determine whether, on the basis of specific findings of fact, there is any practical or feasible alternative, promising greater racial balances in these two grades, to the neighborhood plan proposed by the school district, and, if there is, to amend the plan of desegregation accordingly.

## II.

 The plaintiffs, also, appeal on the ground that the allowance of attorney's fees made to their counsel by the District Court was inadequate. The defendant school district, on the other hand, contends the District Court erred in making any allowance of attorney's fees. It would seem inappropriate, however, to consider this claim until the District Court has resolved the issues,

which on remand, it is hereby mandated to consider. In connection with its final order on those issues, it may make such allowances of attorney's fees as it finds proper under the terms of Section 718, Higher Education Act of 1972.

## III.

The defendant school district has appealed, contending that the District Court erred in imposing its plan of desegregation upon the school district. We have already indicated provisions of the plan which in our judgment, require further consideration by the District Court; except in these particulars, the plan of desegregation adopted by the Court was fair and the objections of the school district are without merit.

Remanded with directions.