**Sylvester J. VAUGHNS, Jr., et al.**

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY et al.**

**Civ. No. 72–375.**

United States District Court,
D. Maryland.

Dec. 13, 1972.

MEMORANDUM

FRANK A. KAUFMAN, District Judge.

*The Issues in this Case*

This case presents the issue of whether Prince George's County School Board (the Board) is:

(1) maintaining its public school system [1] in violation of the commands of

---

1. The tenth largest in the United States. Questions relating to student attendance, faculty, administration and school construction have been raised. By agreement of Court and counsel, priority attention has been focused upon student attendance, in connection with which the taking of evidence and the presentation of argument are expected to be concluded in this Court within the current month of December, 1972. As early as feasible thereafter questions relating to faculty,

the Constitution of the United States; and

(2) if so, what relief is required; and

(3) how and when that relief should be implemented.

### History of this Case and Purposes of this Memorandum

This suit was instituted on March 29, 1972. On July 25, 1972, 355 F.Supp. 1034, at 1037 this Court filed an Opinion in which it concluded [2] that the federal constitutional standards enunciated by the Supreme Court of the United States [3] "command a discontinuation of the current lack of desegregation in the schools of Prince George's County. That lack stems from a pre-*Brown I* segregated system which has never been effectively dismantled and which was not, in its origin, 'a consequence of other types of state action, without any discriminatory action by the school authorities' (*Swann* at 23 of 402 U.S., at 1279 of 91 S.Ct.)." That holding was compelled by the facts in this case, jointly stipulated by the parties, which reveal the great concen-tration of white students in some schools and black students in others.

The history of this case, to and including December 4, 1972, is set forth in the documents in the official court file in this case. That history will be referred to but will not be reviewed in any great detail in this Memorandum, the incidental purpose of which is to update the history of this case but the main purposes of which are to review the legal principles which control the determination of the issues presented and to chart the course which Court, counsel and parties will follow.

The July 25, 1972 Order and Opinion of this Court called for both the Board and a consultant hired by it [4] to present student attendance plans to this Court by August 22, 1972 "so as to bring the Prince George's County school system into total compliance with the *Brown-Swann* standards to the fullest extent possible by September 5, 1972, or if that is not feasibly possible, then to bring that system into such compliance in part to the fullest extent possible by that date. The burden of establishing the

---

administration and school construction will be considered, in and of themselves; at present, they are considered only as they may be interrelated to the question of student attendance. *See* Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18–19, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and cases therein cited. On a tentative basis, counsel are agreed that current faculty assignments and proposals probably meet federal constitutional standards and that administation seemingly does not present a particularly difficult issue. The issue of school construction, described by the Chief Justice in *Swann* (at 21, 91 S.Ct. at 1278) as among "the most important functions of local school authorities" and also as one of "the most complex," has been considered only to the extent that shortly after the commencement of this suit the School Board has stipulated that any new construction which it undertakes will not adversely affect the relief if any to which plaintiffs are entitled herein.

2. All page references to earlier documents filed in this case are to the pages of those

documents appearing in the official court file.

3. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

4. In the July 25, 1972 Opinion, it is noted that "the Board of Education of Prince George's County (Board) entered into a contract dated June 30, 1972, utilizing funds made available to the Board by the federal Department of Health, Education and Welfare, with the Lambda Corporation, a corporation with its principal office in Arlington, Virginia (Lambda), to make a study and a presentation to the Board with the objective 'to assist Prince George's County in the development of a desegregation plan in which specified desegregation objectives are met with a minimum of student transportation.' The commencement date for the study was the latter part of the month of June, 1972." (July 25, 1972 Opinion of this Court, p. 1034 (footnotes omitted)).

need for any delay or delays in whole or in part shall rest upon defendants." [5]

On August 22, 1972, the School Board filed a report. Following lengthy hearings which included interim testimony by an official of the School Board's consulting firm, this Court filed an Opinion on August 31, 1972, 355 F.Supp. 1038 in which it rejected the plaintiffs' plea for implementation of any desegregation order effective September 5, 1972, even as to the tenth and eleventh grades, finding that such early implementation could only become effective if seventeen senior high schools were to remain closed for a period approximating one month. In its August 31, 1972 Order, this Court required that "the desegregation plans for all three levels, elementary, junior high and senior high, should be coordinated and completed at one time. Such a total proposed overall plan shall be presented to this Court on or before December 4, 1972." [6] Additionally, for reasons stated in the August 31, 1972 Opinion, this Court concluded that the change-over at the elementary and junior high levels should become effective January 29, 1973 at the beginning of the second half of the 1972–1973 school year and that the change-over affecting the tenth and eleventh grades should occur in September, 1973. Counsel for all parties have suggested almost from the beginning of this case, and the Court has tentatively concurred, that no changes with regard to the twelfth grade should become effective until September, 1973.

On October 12, 1972, in a per curiam opinion, the Fourth Circuit, sitting *en banc* in connection with an interlocutory appeal in this case, wrote [7] that it "perceive[d] among the substantive questions tendered only one of substantiality," namely, "justification for that portion of the order on this record, when the plans are as yet unformulated", which postpones implementation of the tenth and eleventh grade change-over until September, 1973.

Subsequently, in an Order [8] calling attention to the Fourth Circuit's opinion, this Court required that the School Board submit by December 4, 1972:

(1) A plan pursuant to which the changeover (a) with regard to the tenth and eleventh grades would take place on January 29, 1973 at the same time as the changeover will take effect with regard to the elementary and junior high schools, and (b) with regard to the twelfth grade would take place in the fall of 1973; and

(2) A plan pursuant to which the changeover with regard to the tenth, eleventh and twelfth grades would take place on January 29, 1973 at the same time as the changeover will take effect with regard to the elementary and junior high schools; and

(3) A plan pursuant to which the changeover with regard to the elementary and junior high grades will take place on January 29, 1973 and the changeover with regard to the tenth, eleventh and twelfth grades would take place in the fall of 1973. In connection with that said third alternative plan, all parties are hereby requested, on the one hand, to present to this Court all available facts and opinions with regard to the alleged deleterious effects of a mid-semester changeover with regard to the tenth and eleventh grades, and, on the other hand, all available facts and opinions with regard to, using the Fourth Circuit's words, the "advantages of coordinating the change at all levels" at the same time. Further, counsel for both sides are asked to file with this Court, as soon hereafter as possible and in any event no later than November 15, 1972, citations of cases in which federal courts have ordered mid-year changeovers or changeovers

---

5. Id. at 1034.

6. August 31, 1972 Opinion of this Court, p. 1038.

7. 468 F.2d 894, p. 895.

8. On November 14, 1972, embodying contents of a letter from Court to counsel dated October 19, 1972.

at times other than the commencement of the academic term in the fall of the year.

*Developments Beginning December 4, 1972*

On December 4, 1972 and since that date the School Board has presented a number of alternative plans to this Court, several of which are variants of the principal approach adopted by the School Board. Hearings have been commenced but not completed in connection therewith, and some testimony has been taken. In addition, this Court, with the agreement of the parties and their respective counsel, has discussed on several occasions in chambers with counsel and the staff members to whom the School Board has delegated the major responsibility for preparing the detailed plans, the facts relating to each of the 232 schools in the system,[9] the legal principles which either require or do not require changes in each of them, the effect of transfers of students from one school to another upon still other schools, the effect of any transfer upon transportation schedules and costs, and, above all, the desirability of achieving constitutional standards with regard to desegregation and at the same time limiting the number of students who, by the impact of such standards, will

(1) be transferred to a school other than the one they would otherwise be attending;

(2) become school bus riders rather than walkers; or

(3) be caused to ride additional miles on school busses.

In its August 31, 1972 Opinion, this Court noted[10] that an official of the consulting firm engaged by the School Board had testified that he believed that his firm's "proposals, when completed and coordinated with the plans of the school staff, will permit desegregation of the entire school system, including all twelve grades, without additional transportation expense and perhaps at a reduced total transportation cost; and without invoving more than a minimum increase in the total number of students transported, in the miles each such student would be transported, and in the daily transportation time such additional transportation would require." Unfortunately, that "consummation devoutly to be wished"[11] is not in the cards. There is seemingly nothing to be gained by any further consideration of the reasons why the joint efforts of the staff of the School Board and of the consulting firm have not proved fruitful and why the School Board has at its own request been permitted by this Court to continue without the aid of the consultants. The record in this case sufficiently reveals the history of the relationship.[12] Nor does this Court believe that any current attention should be devoted to plaintiffs' December 4, 1972 petition to this Court to cite the defendants for contempt of its preceding Orders. That petition is hereby denied. While, for reasons discussed below, this Court does not believe that any plan yet presented by the School Board attains constitutional dimensions, it does not find that there has been conduct amounting to contempt. On the other hand, the record discloses repeated and continuing attempts by the School Board to avoid changes required by the law, to develop varying methods for circumvention of the law, to delay any changes which are Court-ordered, and to state as reasons for delay, problems which are

9. 173 elementary, 41 junior high, and 18 senior high.

10. August 31, 1972 Opinion of this Court, p. 1038.

11. *Hamlet*, Act III, Scene 1.

12. This Court at one point believed that it might have proved helpful, during the post-December 4, 1972 hearings, to hear further from one or two Lambda officials. However, in the absence of any request by any such official to appear, there would seem to exist no current reason for such testimony.

capable of at least partial solution without the sacrifice of constitutional rights and principles.

### The Law

The Charlotte-Mecklenburg school system involved in the *Swann* case had about 84,000 students in 107 schools in the 1968–1969 school year, of which about 29% were black and 71% white.[13] In this case, the current Prince George's County school population is about 160,000, approximately 22.4% of whom are black and 77.6% white.[14] The areas in both cases are large—in *Swann*, "550 square miles—spanning roughly 22 miles east-west and 36 miles north-south";[15] in this case, 485 square miles, with, according to counsel and school staff, the maximum cross-country road distance between any two points about fifty miles. At the inception of both cases, there were a large number of schools, particularly, at the elementary level, which were clearly identifiable either as predominantly black or predominantly white. Writing for a unanimous Supreme Court, Mr. Chief Justice Burger wrote in *Swann* (at 11–12 of 402 U.S., at 1274 of 91 S.Ct.):

Nearly 17 years ago this Court held in explicit terms, that state-imposed segregation by race in public schools denies equal protection of the laws. At no time has the Court deviated in the slightest degree from that holding or its constitutional underpinnings.

\* \* \* \* \* \*

The opinion then reviewed the decisions of our highest Court since the pronouncement in *Brown I* that

in the field of public education the doctrine of "separate but equal" has

no place. Separate educational facilities are inherently unequal. \* \* \*[16]

In *Green*,[17] in 1968, the Court had written:

The burden on a school board today is to come forward with a plan that . . . promises realistically to work *now* . . . . until it is clear that state-imposed segregation has been completely removed.[18]

In *Green*,[19] the Court had also stressed that it is the school officials who are

clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.

In *Swann*, Mr. Chief Justice Burger wrote (at 15 of 402 U.S., at 1276 of 91 S.Ct.):

If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. \* \* \*

In this case, the Prince George's County School Board, despite repeated warnings by officials of the federal Department of Health, Education and Welfare (HEW), and in the face of debate and discussion at countless board meetings, has continued, up to the present time, as is recited in this Court's July 25, 1972 Opinion, to operate a system (which at the time of *Brown I* in 1954 was segregated by state law) under standards rejected by the Supreme Court in *Green* and again in *Swann*. *Swann* is written in detailed and easily understandable language. No counsel, or staff expert, who has participated in discussions with Court or counsel, has indicated any lack of understanding of *Swann*. And yet the School Board has

---

13. *Swann, supra* at 6–7 of 402 U.S., 91 S. Ct. 1267.

14. July 25, 1972 Opinion of this Court, p. 1034.

15. *Swann, supra* at 16 of 402 U.S., at 1276 of 91 S.Ct.

16. *Brown I, supra* at 495 of 347 U.S., at 692 of 74 S.Ct.

17. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

18. *Green, supra* at 439 of 391 U.S., at 1694 of 88 S.Ct.

19. *Green, supra* at 437–438 of 391 U.S., at 1694 of 88 S.Ct.

persisted, until the end of last week, in presenting views and plans to this Court which are clearly violative of *Swann*, a decision binding upon this Court and also upon the Prince George's County School Board, and every court and school board throughout the land. "This," as Judge MacMillan wrote in the District Court in *Swann*, "is a matter of law, not anarchy; of constitutional right, not popular sentiment." [20]

In this case, the School Board itself determined as one of its major desegregation aims to decrease to 35%, wherever feasible, the black population of any school currently having a school body more than 50% black. Neither this Court nor plaintiffs' counsel opposed that aim, nor an alternative planning proposal changing the 35% to 40%. But this Court has repeatedly sought a flexible approach, not keyed to or restricted by any foreordained mathematical formula, and has called attention to Mr. Chief Justice Burger's words in *Swann* (at 24 of 402 U.S., at 1280 of 91 S.Ct.):

> If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

Again, only last June, Mr. Justice Stewart, in the majority opinion in *Wright v. Council of City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), and the Chief Justice in his dissenting opinion, warned of the need to reject any requirement of a fixed racial percentage.

 Those plans which have been presented to date by the School Board have by their own adherence to one or more fixed mathematical percentages called for more student transfers from school to school and the transformation of more walkers into bus users, than is necessary. Apparently, by so proposing, the School Board hoped to convince this Court to leave undisturbed many schools, particularly neighborhood elementary schools, whose current black-white populations place them within the category of one-race or largely one-race schools and most of whose students can walk to school. That result cannot obtain. While "[i]n some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change [21] and while "the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law," [22] nevertheless:

> Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.[23]

Noting the use of tools such as gerrymandering of school districts and attendance zones, and pairing, clustering and grouping of schools, the *Swann* Court states:

> Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it

20. 311 F.Supp. 265, 267 (W.D.N.C.1970).

21. *Swann, supra* at 25 of 402 U.S., at 1281 of 91 S.Ct.

22. *Swann, supra* at 26 of 402 U.S., at 1281 of 91 S.Ct.

23. *Swann, supra* at 26 of 402 U.S., at 1281 of 91 S.Ct.

might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.[24]

And, continuing, the *Swann* opinion specifically approved the bussing portions of the District Court's decree (at 31–32 of 402 U.S., 91 S.Ct. 1267) under the circumstances of that case.

■■ The plans presented to date to this Court would result in the elimination of many predominantly one-race schools, but would leave a large number in existence. While a few such situations might well be justifiable in view of the great distances between certain schools, the continuation of many predominantly one-race schools, simply to avoid turning walkers into users of busses, cannot be permitted. That is a major lesson of *Swann*. The neighborhood school concept, no matter how attractive, cannot, at the elementary or any higher level, compel a continued pattern of unconstitutional segregation.

A school-by-school analysis of each of the units within Prince George's County, under the guidance of School Board staff experts, has been and is being made by Court and counsel in this case. Hopefully, within the next ten days, and certainly if at all possible before Christmas, revised plans which meet the *Brown-Swann* tests will be submitted and will be the subject of evidentiary hearings. Counsel for the School Board

and counsel for the intervenors, while cooperating fully with this Court and plaintiffs' counsel in the consideration of desegregation plans, have stated candidly that they will seek delay in the implementation of such plans, whatever provisions they may contain, until at least September, 1973, even though all of such counsel have noted their recognition of the heavy burden placed upon those seeking delay by *Green*, *Alexander*,[25] *Carter*[26] and *Swann* and by the Fourth Circuit's statement in its per curiam opinion in this case. The principles set forth in those cases are not inapplicable in connection with a mid-year change-over. Thus, in Stanley v. Darlington County School Dist., 424 F.2d 195 (4th Cir. 1970), Chief Judge Haynsworth ordered a mid-year change, stating (at 196): "Whatever the state of progress in a particular school district and whatever the disruption which will be occasioned by the immediate reassignment of teachers and pupils in midyear, there remains no judicial discretion to postpone immediate implementation of the constitutional principles as announced in" *Green*, *Alexander* and *Carter*. Even more significantly, in the *Darlington* case, the Fourth Circuit stated (at 197) in denying a petition for rehearing: "It is true . . . that a general reassignment of 58,000 pupils and their teachers at this time of year will occasion great disruption, and that much educational advantage may be lost through the process of readjustment. The court, however, was not unmindful of these things at the time of entry of its order" (at 197). And in Nesbit v. Statesville City Bd. of Education, 418 F.2d 1040 (4th Cir. 1969), the Fourth Circuit, in the light of *Alexander*, ordered mid-year change-overs without discussing whether educational disruption would justify delay.

24. *Swann, supra* at 28 of 402 U.S., at 1282 of 91 S.Ct.

25. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

26. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1969).

The likelihood of an appeal from this Court's final Order[27] will be kept in mind. To that end, expedited copy is being provided of all evidentiary hearings. However, as of this date, counsel for defendants and intervenors have asked this Court to permit them to delay the completion of the presentation of testimony until revised plans have been completed by the School Board staff. This Court, while acquiescing in that request, will do its best to complete these proceedings and file its final Order at the earliest possible date. That Order will be based upon the constitutional requirements enunciated by the Supreme Court; hopefully, it will also call for the adoption of *the* Plan selected by the Prince George's County School Board itself as that one among many constitutionally permissible plans which that Board creates as the most educationally sound and the one which best reconciles competing public and private interests.

**27.** Any contention that the provisions of section 803 of the Education Amendments of 1972, Pub.L. 92–318, § 803 (June 23, 1972), providing for postponement of the effect of certain federal District Court orders "until all appeals . . . have been exhausted", applies herein, has seemingly been rejected in four separate individual Orders by Mr. Justice Powell in Drummond v. Acree, 409 U.S. 1228, 93 S.Ct. 18, 34 L.Ed.2d 33 (September 1, 1972); by Mr. Justice Rehnquist in Board of Education of Okla. City Public Schools, et al. v. Robert L. Dowell (August 23, 1972), and Metropolitan County Bd. of Education of Nashville, et al. v. Kelley, et al. (August 28, 1972); and by Mr. Justice Douglas in Guinn v. Kelly (September 5, 1972).