**Sylvester J. VAUGHNS, Jr., et al.**

**v.**

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY et al.**

**Civ. No. 72–325.**

United States District Court, D. Maryland.

Dec. 29, 1972.

---

Richard V. Falcon, Kenneth L. Johnson and Gerald A. Smith, Baltimore, Md., for plaintiffs.

Paul M. Nussbaum, Mt. Rainier, Md., for defendants.

Emmett H. Nanna, Jr., Hyattsville, Md., for intervenors.

FRANK A. KAUFMAN, District Judge.

This opinion is the culmination of proceedings instituted in this Court on March 29, 1972 seeking the establishment of a constitutional system of public school education in Prince George's County, Maryland. In earlier opinions this Court has held that that system is presently in violation of the federal constitutional standards set forth by the Supreme Court of the United States in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*), and Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (*Swann*). Defendants have at all times since the commencement of this case contended that the Prince George's school system complies with constitutional requirements and, in the alternative, that the system attained such compliance in the mid-1960's and that no "ac-

tion by the school authorities"[1] has caused it to fall out of compliance since the mid-1960's. Accordingly, the defendants contend that there is presented in this case the question of

whether a showing that school segregation is a consequence of other types of state action, without any discriminatory action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree. * * *[2]

In *Swann* (at 22–23 of 402 U.S., 91 S.Ct. 1267), the Chief Justice stated that it was not necessary for the Court to reach that question. Neither is it necessary in this case for this Court to reach that question, since the facts to which the parties stipulated—all of which facts are undisputedly set forth in the records of the School Board itself—reveal that the pre-*Brown I* segregated system was never effectively dismantled, either before or after 1956 when the School Board adopted a "freedom of choice" plan.[3]

■ On May 27, 1968, in Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court held that a freedom of choice concept would be a valid remedial measure only if it was effective and only if it "promises realistically to work *now*". The present Prince George's County school population is approximately 160,000, of which about 22.4% is black. Since May 27, 1968, the School Board has opened 35 new schools—5 senior high, 10 junior high and 20 elementary. Of that 35, 24, or over ⅔ of the 35, opened with—and 23 of those 24 still maintain today—student populations more than 50% black or less than 10% black;[4] and 5 of them opened with more than

---

1. *Swann* at 23 of 402 U.S., 91 S.Ct. 1267.

2. *Swann* at 23 of 402 U.S., at 1279 of 91 S.Ct.

3. *See* the discussion in this Court's opinion filed July 25, 1972, 355 F.Supp. 1034, pp. 1035–1036.

4. *See* Prince George's County Public Schools, Report of Schools, 1953–1954 School Year to 1971–72 School Year, filed

as an exhibit in this case, which also reveals that of the 232 schools in Prince George's County today, 153 of them have opened since September, 1954, and of that 153, 135 opened with over 90% white or more than 50% black; and that of that 135, 9 were senior high, 27 junior high and 99 elementary. Schools opened after September, 1954 but closed before September, 1971 have not

90% black student population and 13 of them with more than 90% white population.[5] That record has been compiled not only in the face of *Green* but after the United States Court of Appeals for the Fourth Circuit emphasized in Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37, 42 (4th Cir. 1968),[6] that a "school construction program is an appropriate matter for court consideration . . . ." In *Swann* (at 20, 21 of 402 U.S., 91 S.Ct. 1267), writing in 1971, Mr. Chief Justice Burger stressed, *inter alia,* the importance of new school construction in order to achieve and maintain a desegregated school system.

That factual and legal background and the facts reviewed in earlier opinions of this Court compel the conclusion that regardless of the reason why, the Prince George's County School Board has disregarded the mandates of the highest Court of our land. It was for that reason that this Court ordered on August 31, 1972, 355 F.Supp. 1038, and again on November 14, 1972 after the Fourth Circuit filed its opinion in this case on October 12, 1972, 468 F.2d 894, the presentation by defendants, on or before December 4, 1972, of plans embodying changeovers to a constitutional school system to become effective in whole or in part on January 29, 1973. While the School Board presented four alternative plans on December 4, 1972, one of them (denominated as Plan IV) is based upon the same freedom of choice principles which had failed in Prince George's County to produce a constitutional system in the past. Thus, under *Green,* that plan cannot pass constitutional muster. Plan I, the only one of the four plans submitted on December 4, 1972 which was supported with any detailed facts and analyses,[7] was based upon a rather rigid application[8] of a self-imposed mathematical standard calling for the reduction of the black student populations of all schools being more than 50% black to 35% or less black[9] and leaving untouched 82 schools having white populations of more than 90%.[10]

been included in the totals. Schools designated as "Jr.-Sr." in the aforesaid Report have been treated as junior high schools in compiling these figures and the figures in n. 5 *infra.*

5. *See* that same Prince George's County Public Schools, Report of Schools, 1953–1954 School Year to 1971–1972 School Year, filed as an exhibit in this case, which further reveals that of the 153 schools opened in Prince George's County since September, 1954 (*see* n. 4 *supra*), 127 opened with student populations either 90% or more black or 90% or more white, and that of that 127, there were 7 senior high schools, 27 junior high schools and 95 elementary schools.

6. The *Brewer* opinion, filed May 31, 1968, four days after *Green,* cited *Green* (*Brewer* at 39).

7. And even Plan I was only so supported with relation to senior and junior high schools. Plan I, as submitted on December 4, 1972, contained no details or breakdowns re the elementary schools. Those details were supplied at a later date to this Court. And Plan I was also changed in other respects than indicated within its own documentary presentation to this Court. *See* the two-starred comment to Chart III on page 1056 *infra.*

8. The Chief Justice's warning in *Swann* and in his dissent in Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), and Mr. Justice Stewart's similar warning in his majority opinion in *Wright,* against the use of any rigid mathematical formula is discussed in this Court's Memorandum filed December 13, 1972, pp. 1048–1049 of 355 F.Supp.

9. Plan II utilizes a 40% guideline in place of the 35% guideline in Plan I. However, *no* details whatsoever were submitted in connection with Plan II (or Plans III or IV for that matter). Plan III involves changing the racial composition of only eight schools—one senior high, one junior high and six elementary—all of which opened 100% black, to 35% black.

10. Of that 82, 2 were senior high, 2 junior high and 78 elementary. Plan I also included a large scale transfer at one school for the sole purpose of achieving a 2% change from 28% black to 26% black. That change has been eliminated from the School Board's staff plan submitted to this Court on December 26, 1972 and discussed *infra.*

On December 7, 1972, a further revised but still unconstitutional plan [11] was submitted, calling for 32 schools with a white student population of more than 90%. With time slipping rapidly toward January 29, 1973 and with no constitutional plan in sight, this Court, on December 7, 1972, with the consent of the parties and their counsel, instituted a series of lengthy chambers conferences with counsel and with staff experts of the Prince George's County School system. During those conferences, those staff officials demonstrated familiarity with the commands of the Supreme Court in *Swann* and also demonstrated the willingness and the ability under time pressure to produce a constitutional plan.[12] That plan has been accepted as "educationally sound" by defendants if its implementation is delayed *in toto* until September, 1973 and by plaintiffs as constitutionally sufficient.[13] Plaintiffs seek implementation of the plan on January 29, 1973, except with regard to the twelfth grade, and otherwise ask only that this Court, in the exercise of its continuing jurisdiction,[14] be ready to require further changes if school attendance shifts operate in the near future to resegregate any school.

■ The staff plan calls for a relatively small number of schools [15] to remain more than 90% white but for none, except for the only two schools in the County which are to be "paired", to be more than 50% black. Most of those which are more than 90% white are expected to become a lesser percentage white as new school construction and expected demographic changes occur.[16] The staff plan was prepared with full attention focused upon "the desirability of achieving constitutional standards with regard to desegregation and at the

---

11. This plan was a further development of Plan II presented on December 4, 1972 and still contained a rigid 40% guideline.

12. This Court has been informed that that staff plan was presented on December 22, 1972 to the School Board and was rejected by a 5 to 4 vote, and that one of the reasons stated by one or more of the Board members for rejection was that the Board had insufficient time to consider the plan. Any approach based upon "insufficiency of time for consideration" of the staff plan submitted to the School Board on December 22, 1972 and to this Court on December 26, 1972 is rejected by this Court. On August 31, 1972 and continuously thereafter to and including December 4, 1972, the School Board was required by Orders of this Court to prepare plans meeting *Brown-Swann* standards—and failed to do so. The differences between Plan I submitted December 4, 1972 and the staff plan are easily explainable to any one who was familiar with the details of Plan I, particularly, if as this Court assumes, each School Board member became familiar with, if not before August 31, 1972, certainly shortly thereafter, the racial compositions of the student populations of each school, the capacity of each school for student attendance, the location of each school and the roads leading to it, and the interrelationships of those facts—as well as with the plain and clearly spoken words of the Chief Justice in *Swann*.

13. Intervenors contend that the existing school system is constitutional and take no position as to the staff plan.

14. *See* page 1064, *infra*, referring to Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968).

15. Eleven schools, 2 senior high, 4 junior high, and 5 elementary, will be less than 10% black, but nine of that eleven will be 8.2% or more black. One of the two remaining schools is a junior high school which will remain at its present level of 5.6% black and the other remaining school is an elementary school which will change from 2.4% to 7.5% black.

16. In Green v. County School Board, *supra* at 442, of 391 U.S., at 1696 of 88 S.Ct., the Supreme Court stated that a plan meeting constitutional standards converts a school system to one without white schools or black schools but just schools. *See also* Raney v. Board of Education, 391 U.S. 443, 448, 88 S.Ct. 1697, 20 L. Ed.2d 727 (1968). In Monroe v. Bd. of Comm'rs, 391 U.S. 450, 456–458, 88 S.Ct.

same time limiting the number of students who, by the impact of such standards, will

(1) be transferred to a school other than the one they would otherwise be attending;

(2) become school bus riders rather than walkers; or

(3) be caused to ride additional miles on school busses." [17]

In that regard, the following charts are revealing:

CHART I

| Percentage of Students | Entire School System | Senior High | | Junior High | Elementary Including Kindergarten |
|---|---|---|---|---|---|
| | | 10th, 11th & 12th | 10th & 11th | | |
| Presently eligible for busing | 48.4% | 73.3% | 73.3% | 57.8% | 36.2% |
| Eligible for busing under Plan I submitted 12/4/72 | 56.4% | 74.7% | 74.7% | 63.8% | 47.2% |
| Eligible for busing under staff Plan submitted 12/26/72 | 56.1% | 74.5% | 74.5% | 62.4% | 47.3% |

1700, 20 L.Ed.2d 733 (1968), the Court reaffirmed the principles set down in *Green* and held that a "free-transfer" plan resulting in one junior high being all black, one junior high with 812 white and 12 black students and one junior high with 349 white and 135 black students (the ratio of black-white students throughout the school system was 40-60) did not satisfy the *Green* test of converting to "just schools".

In *Swann* (71% white pupils, 29% black in a school system of 84,000 students), the Supreme Court affirmed a desegregation plan in which 9 of the 10 high schools had 17%–36% black students with one high school having 2% blacks; 20 of 21 junior highs having 0%–38% blacks with one junior high having 90% blacks; and 76 elementary schools having 9% to 38% blacks. The Court in *Swann* (at 15 of 402 U.S., 91 S.Ct. 1267) stated that in formulating a desegregation order, "flexibility" and "mercy" reconciling the needs between the public interest and private needs as well as between competing private claims should be used. In *Swann*, the District Court set as a goal a ratio of 71%–29% (white-black pupils) in each *school* and aimed at a 71–29 ratio in each grade. The actual plan varied widely from the goal (as low as 0% blacks to as high as 38% blacks with one school 90% black). The Supreme Court approved the use of a 71–29 ratio as a starting point but stressed that it was not to be used as an inflexible requirement (*see* n. 8 *supra*).

In McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971), the Court approved a plan for elementary schools with a ratio of 66% white–33% black students throughout the system and in which the black student population at each school varied from 20%–40% with two schools at 50%.

In Davis v. Bd. of Comm'rs of Mobile County, 430 F.2d 883 (5th Cir. 1970), the Fifth Circuit approved a desegregation plan in a school system with a ratio of 58%–42% white to black students in which senior highs (10) had from 8% to 69% black, junior highs from 8% black to 85% black, and elementary schools from 0%–100% black and with percentages ranging from 7% black to over 90% black (total students in the system was 73,000). Those figures are estimates (based on data set forth at 430 F.2d *supra* at 889). They exclude schools in Mobile, Alabama lying west of I–65 which the Fifth Circuit treated separately but which the Supreme Court subsequently ruled had to be treated as not lying in a separate section but as part of one overall Mobile system. 402 U.S. 33, 91 S.Ct. 1267 (1971). However, the Supreme Court at no point indicated any disapproval of the ratios of blacks in the schools lying east of I–65.

17. Memorandum of this Court in this case, filed December 13, 1972, p. 1047 of 355 F. Supp.

### CHART II

| Number of Students | Entire School System * | Senior High 10th, 11th & 12th | Senior High 10th & 11th | Junior High | Elementary Including Kindergarten |
|---|---|---|---|---|---|
| Presently eligible for busing | 78,364 | 22,595 | 13,953 | 22,370 | 33,399 |
| Eligible for busing under Plan I submitted 12/4/72 | 91,304 | 23,047 | 14,269 | 24,722 | 43,535 |
| Eligible for busing under staff Plan submitted 12/26/72 | 90,761 | 22,952 | 14,203 | 24,162 | 43,647 |

\* Total includes all children eligible to be transported. This data obtained from the Annual Transportation Report, September, 1972, compiled by the Pupil Accounting Office. The words "Entire School System" as used in all three charts include kindergarten through 12th grade. See, e. g., n. 19A, infra, and compare the total of 12,290 students made eligible for busing in all grades except the 12th grade as opposed to 12,397 (90,761–78,364).

### CHART III

| Number of Students | Entire School System | Senior High 10th, 11th & 12th | Senior High 10th & 11th | Junior High | Elementary Including Kindergarten |
|---|---|---|---|---|---|
| To be Transferred under Plan I submitted 12/4/72 | 34,103 * | 7,205 | 5,182 | 12,023 | 16,898 ** |
| To be Transferred under staff Plan submitted 12/26/72 | 32,823 *** | 5,561 | 4,037 | 8,051 | 20,735 |

\* Does not include 1,504 seniors who remain at their present schools because of delay in 12th grade implementation until September, 1973.

\*\* Page 30 of Plan I states that 70% of the 91,447 elementary school students would be "involved in some form of change". That plan apparently included many pairings and clusterings. The figures used in this chart are revised to exclude almost all of those pairings and clusterings. However, neither Plan I nor any presentation of it by counsel for defendants ever explained that elimination. Thus, until after December 26, 1972, this Court was advised that Plan I would affect over 64,000 elementary school students as well as certain additional junior high and senior high students.

\*\*\* Does not include 2,023 seniors who remain at their present schools because of delay in 12th grade implementation until September, 1973.

---

The use of the words "eligible for busing" is to be noted. There are apparently no figures which reflect the number of students eligible for busing who utilize private transportation—and thus no figures showing the number actually presently bused. However, the staff plan will make eligible for busing less than 8% more of the total population than are now so eligible.

This Court cannot sufficiently commend the efforts and the accomplishments of the School Board staff members who, as professionals, have completed the staff plan submitted on December 26, 1972. While that plan will require changes in the school attendance of a large number of students, it also provides a maximum busing time per trip for any student from the moment the student ascends a school bus until the bus arrives at school (and the same for the return trip) of 35 minutes, with a mean average of about 14 minutes per one-way bus trip from home to school, or school to home.[18]

18. *Compare* with the apparent maximum 35 minute trip embodied in the Charlotte-Mecklenburg plan approved in *Swann* (at 30 of 402 U.S., 91 S.Ct. 1267) though in that case the 35 minutes apparently represented a reduction in the maximum one-

A careful review of the staff plan, or even a quick review of the chart included at p. 1055 *supra,* discloses that while the staff plan will cause changes in student attendance and in bus eligibility at the senior and junior high levels, it will cause many more such changes to occur in the elementary schools.[19] The staff members who participated in the chambers conferences have indicated that in their opinion there is no way to achieve desegregation at the elementary level within the *Brown-Swann* standards without assigning some students to an elementary school which is not the nearest elementary school to the student's home. In an effort to comply with *Brown-Swann* standards and at the same time to keep each child at a school as close as possible to his home, the staff plan calls for the establishment of 11 elementary school geographic sectors. No student living within any sector will be attending school outside of that sector.[20]

No one has ever suggested that the neighborhood school concept is not attractive, and all other things being equal, preferable to any other guiding concept. But *Swann* teaches that it cannot rigidly be maintained to thwart desegregation,[21] particularly where a substantial number of the schools opened on a pre-

way bus trip time which existed prior to Judge McMillan's *Swann* decree. *See also* the approved "30 minutes each way" plan in Brewer v. School Board of City of Norfolk, Virginia, 456 F.2d 943, 945 (4th Cir.), cert. denied, 406 U.S. 905, 92 S.Ct. 1611, 31 L.Ed.2d 815 (1972) ; *and see* Northcross v. Board of Education of Memphis, 466 F.2d 890, pp. 894–895 (6 Cir. 1972) and the quotation set forth from that case in n. 21 *infra.*

19. 250 tenth and eleventh graders will become eligible for busing as will 1792 junior high students and 10,248 elementary school students, or a total of 12,290 for the school population from kindergarten through the eleventh grade.

20. The Introduction to the staff plan states :

> A sincere effort was made to keep communities together and not involve the same neighborhoods at all three educational levels. Where communities have been affected at all levels, it was unavoidable.

21. "The School Board does not contest the fact that any further substantial desegregation cannot be accomplished without the transportation of school children ; nor, as discussed in the preceding paragraphs is there any reason to believe that such further desegregation is not required. Nevertheless the School Board opposes the use of busing in this case. Its position is simple ; the use of compulsory busing for desegregation purposes is unwise and counterproductive. In short, the School Board argues, busing for the purposes of desegregation 'is wrong.'

"The Supreme Court has, of course, come to the opposite conclusion in a recent unanimous decision, holding that 'bus transportation' is one 'tool of desegregation' which school authorities may be required to use. *Swann, supra,* 402 U.S. 1, 30, 91 S.Ct. 1267 [28 L.Ed. 2d 554]. Recognizing this to be the holding of *Swann,* Defendants nevertheless suggest that we come to a contrary conclusion on the basis of a single piece of much criticized sociological research, the conclusions of which are, by its own terms, inapplicable to the Southern school pattern. It would be presumptuous in the extreme for us to refuse to follow a Supreme Court decision on the basis of such meager evidence. *Swann* is controlling and requires us to sanction the use of bus transportation as a tool of desegregation when, as here, such busing is necessary to accomplish the dismantling of the dual system and its use does not pose intolerable practical problems.

"With respect to this latter point we note that the most serious practical problem which busing commonly presents—that of requiring children to spend an excessive amount of time on the buses—is not a factor in this case. Under the plan adopted by the District Court the maximum time to be spent on the buses by any child is 34 minutes— slightly less than the maximum time involved in the *Swann* case and there found acceptable. See 402 U.S. at 30, 91 S.Ct. 1267" [Northcross v. Board of Education of Memphis, *supra* 466 F.2d at p. 894, 895. (footnotes omitted).]

Moreover, the following words used by the Chief Justice in Davis v. Board of School Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971), an

dominantly one-race basis after 1954 and even after the *Green* opinion of May, 1968. Additionally, it must be noted that in Prince George's County, transportation to school on school busses is not presently, at any school level, the exception. Rather, busing is an existing condition for nearly one-half of the entire student population and more than one-third of the elementary school population. As the charts set forth *supra* reveal, over 48% of the students are currently eligible for busing. That percentage under the staff plan will be increased to about 56%. The percentages increase a bit over 1% for the senior high students, between 4% and 5% on the junior high level, and a bit over 11% on the elementary school level.

On October 12, 1972, in its per curiam opinion in the interlocutory appeal in this case, the Fourth Circuit wrote[22] that this Court's August 31, 1972 Order

> scheduled a hearing on the plans in December and provided that the plans, with respect to the primary schools and the junior high schools, would be made effective on January 29, 1973, the date of the semester break. With respect to the senior high schools, however, the order provided that the plans would not be placed into effect until September 1973.

> The right to take an appeal from each of the orders under the present circumstances is contested, and the resolution of those procedural questions involve difficult considerations. We think it unnecessary to attempt to resolve them, for we perceive among the substantive questions tendered, only one of substantiality, and that one is, and will be, within the bosom of the District Court.

> The general rule requires that plans for the desegregation of school systems be made effective as soon as they practically may be without serious disruption to the educational process.[*]

[*] Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L. Ed.2d 19 (1969) ; Carter v. West Feliciana Parish School Board, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969).

> It is contended here that, in light of the general rule the District Court should not have included in its August 1972 order a provision postponing implementation of the plan with respect to the senior high schools until September 1973. With the possible exception of the twelfth grade, the graduating class, it is difficult to find justification for that portion of the order on this record, when the plans are as yet unformulated and the advantages of coordinating the change at all levels cannot be weighed against what difficulties may be encountered in the implementation of the plan for the senior high schools at mid semester.

> It seems clear to us, however, that the timing of the implementation of the plans, when approved, at all levels is subject to reconsideration in the District Court in light of the actual plans and the extent of the changes within the school system which their implementation will require.

> This question should first be addressed to the District Court and con-

---

opinion filed on the same day as *Swann*, may not be disregarded :

> As we have held, "neighborhood school zoning," whether based strictly on home-to-school distance or on "unified geographic zones," is not the only constitutionally permissible remedy ; nor is it per se adequate to meet the remedial responsibilities of local boards. Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. A district court may and should consider the use of all available techniques including restructuring of attendance zones and both contigious and noncontiguous attendance zones. See Swann, supra, at 22–31 of 402 U.S., at 1279 of 91 S.Ct. The measure of any desegrgeation plan is its effectiveness.

22. 468 F.2d at pp. 895, 896.

sidered by it in light of the situation as it shall appear when otherwise approvable plans are in hand.

Since there appears to be no substantive issue of substantiality ready for decision in this Court, we need not undertake resolution of the procedural questions. The case will be remanded for further proceedings in the District Court.

Defendants seek delay in the implementation of the staff plan at any and all levels until September, 1973. All parties to this case are agreed that the present 12th graders should not be required by a desegration plan to transfer to another school in mid-term of the 1972–73 school year, in view of the proximity of their graduation in June, 1973.

The postponement of implementation with regard to the twelfth grade from January 29, 1973 to September, 1973 will cause, under the staff plan, an additional one-time cost of about $56,000 and will apparently not interpose too many difficulties in the implementation in January, 1973 as to the other eleven grades. A definite conclusion in that latter regard is not possible because of the defendants' failure to submit at any time many of the details called for by this Court's November 14, 1972 Order.[23] Nevertheless, the exclusion of the graduating class obviously makes sense.

In that connection, the approval of similar exclusions in Brewer v. School Board of City of Norfolk, Virginia, 456 F.2d 943, 945–946 (4th Cir. 1972), and in Swann v. Charlotte-Mecklenburg Board of Education, 311 F.Supp. 265, 270 (W.D. N.C.1970), is noted. Accordingly, the implementation of the 12th grade changeover will be delayed until September, 1973. There will, however, not be any delay beyond January 29, 1973 as to any other grade.[24]

The existence of electives and semester courses in all three senior high grades— the 10th, 11th and 12th—plus other problems in connection with a mid-year shift, was noted in this Court's August 31, 1972 opinion.[25] Evidence presented in this case in August, 1972 caused this Court to become quite concerned about a mid-year changeover in any of the three senior high grades. That concern still exists and indeed has been buttressed by evidence presented during the current month of December, 1972 and as late as December 26, 1972. But this Court must take note of the Fourth Circuit's comment in its October 12, 1972 per curiam opinion in this case that on the then current state of the record "it is difficult to find justification" for the delay in the senior high changeover from January 29, 1973 to September, 1973, "[w]ith the possible exception of the twelfth grade."[26] The additional evidence and argument received in this

23. *See* the Memorandum filed by this Court on December 13, 1972, 355 F.Supp. 1044, 1046, 1047.

As to costs generally, the staff has estimated the costs of implementation at about $1,100,000 per school year plus the cost of new equipment. However, those cost figures are averages based upon, and extensions of, existing costs and may well be substantially reduced by additional study and by experience. They were arrived at by staff members with little, if any, time for cost analyses. In any event, the appropriate governmental authorities have the duty to provide the funds necessary to operate a school system in Prince George's County in conformity

with constitutional standards. Griffin v. School Board of Prince Edward, 377 U.S. 218, 232–233, 84 S.Ct. 1226, 12 L. Ed.2d 256 (1964).

24. The Introduction to the school staff plan states: "Attempts were made to retain the kindergarten pupils in their respective schools for the remainder of the 1972–73 school year. However, complications are present with regard to teacher assignment, transportation schedules and splitting of families at the elementary level."

25. At p. 1049 of 355 F.Supp.

26. P. 1046.

Court since the Fourth Circuit so wrote is revealing but is either only cumulative or only supportive. The additional evidence does supply more details to buttress the August testimony as to disruption of schedules and difference in course treatment at various schools both as to content and time of availability. But in essence the evidence received in this Court since the Fourth Circuit spoke in this case is not new and simply justifies this Court's acceptance of the August evidence as reliably presenting the difficulties which were described to this Court in August. Additionally, this Court's further reading of the Supreme Court and Fourth Circuit opinions discussing delay [27] has convinced it that what was true in the Darlington, South Carolina case in 1970, when a mid-year implementation of a school desegregation plan required transfers within a 58,000 school population (slightly more than 30% the size of the current school attendance in Prince George's County), is true in this case, namely:

> Whatever the state of progress in a particular school district and whatever the disruption which will be occasioned by the immediate reassignment of teachers and pupils in mid-year, there remains *no judicial discretion* to postpone *immediate* implementation of the constitutional principles as announced in *Green* . . . ; *Alexander* . . . ; [and] *Carter* . . . .[28]

27. *See* the discussion in this Court's December 13, 1972 Memorandum, p. 1050 of 355 F.Supp.

28. Chief Judge Haynsworth writing in Stanley v. Darlington County School Dist., 424 F.2d 195, 196 (4th Cir. 1970) (emphasis supplied; full citations omitted). An analysis of the Supreme Court's statements as to delay indicates the reasons for the strength of Judge Haynsworth's words. Thus, in Carter v. West Feliciana School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), there was a mid-year implementation of a desegregation order, apparently affecting all grades (at 294, 90 S.Ct. 608). Mr. Justice Harlan and Mr. Justice White, in a concurring opinion, expressed the view that the "maximum" timetable for implementing a desegregation plan (including times for judicial review) after a finding of *de jure* segregation was eight weeks (at 293, 90 S.Ct. 608). Four of the Justices, Black, Douglas, Brennan and Marshall, thought the views of Justices Harlan and White represented a retreat from the requirements of Alexander v. Holmes, 396 U.S. 19, 90 S.Ct. 29, 24 L. Ed.2d 19 (1969), and thus disagreed with Mr. Justice Harlan's concurrence. Presumably, those four Justices thought eight weeks was too long a timetable to effect a desegregation order after a finding of non-compliance with *Brown I*. The Chief Justice and Mr. Justice Stewart stated that they would not have peremptorily reversed the Fifth Circuit since "[t]hat court is far more familiar than we with the various situations of these several school districts . . . and has exhibited responsibility and fidelity to the objectives of our holdings in school desegregation cases" (at 294 of 396 U.S., at 610, of 90 S.Ct.). None of the Justices, other than perhaps the Chief Justice and Mr. Justice Stewart, stated or implied that educational disruption would justify waiting beyond the eight-week maximum. Further, there is no Supreme Court opinion which indicates that educational disruption *per se* justifies any delay in implementing a desegregation plan.

In *Alexander*, the Court ordered the immediate implementation of a desegregation order (at 20 of 396 U.S., 90 S.Ct. 29) in mid-year without any discussion of possible disruptive educational effects. *See also Alexander* on remand, 423 F.2d 1264, (5th Cir. 1969). *And see also* Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5 (1958). In that case, the Little Rock School Board sought to delay the desegregation of schools after racial animosity in the community almost assured that violence and educational disruption would occur (358 U.S. at 15, 78 S.Ct. 1401). The Supreme Court refused any delay stating (at 16 of 358 U.S., at 1409 of 78 S.Ct.):

> The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. As this Court said some 41 years ago in a unanimous

Those words appear in an opinion filed *January 19, 1970* ordering implementation on *February 9, 1970* or if absolutely necessary as late as *February 16, 1970*. During oral argument on December 26, 1972, counsel for defendants informed this Court that the District Court record in the *Darlington* case discloses that the mid-year transfer plan involved about one-tenth of the Darlington school population whereas the staff plan in this case will call for transfers of about one-sixth of the students in Prince George's County. Also, in his closing oral argument, counsel for the School Board urged upon this Court the

contention that the principles of *Green, Alexander, Carter,* and *Darlington,* requiring that constitutionally required changes not be delayed until the commencement of the following school year and that such changes be made as promptly as possible during a school year, are not necessarily applicable to a school system as large as that of Prince George's County. But there is no indication in any decided case, known to this Court, including the currently pending Memphis case [29] involving a system comprised of about 145,000 students and the currently pending Atlanta case [30] involving 94,979 school students that if the

opinion in a case involving another aspect of racial segregation: "It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution." Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 62 L.Ed. 149. . . . Thus law and order are not here to be preserved by depriving the Negro children of their constitutional rights. The record before us clearly establishes that the growth of the Board's difficulties to a magnitude beyond its unaided power to control is the product of state action. Those difficulties, as counsel for the Board forthrightly conceded on the oral argument in this Court, can also be brought under control by state action.

29. In the Memphis desegregation case, the District Court, after the Sixth Circuit's August 29, 1972 opinion in Northcross v. Board of Education of Memphis, 466 F.2d 890 (6th Cir. 1972), recently ordered on September 26, 1972 the implementation, on January 22, 1973 (the beginning of the second semester), of the first of two phases of a desegregation plan applicable to most of the elementary and junior high schools but only a relatively small number of senior high school students. The second phase of the plan is not expected to be ready for implementation until the fall of 1973. By contrast, the entire staff plan in this case, as applied to all levels of education, is ready for implementation on January 29, 1973

subject only to the educational soundness of implementation on that date, or to put it another way, subject only to the educational reasons for delaying the implementation, in whole or in part, until September, 1973. It is also to be noted that the Sixth Circuit (p. 892) stated that it was "[m]indful of the need for speedy implementation of appropriate desegregation orders" and cited *Alexander, Carter* and *Green.* Thus, clearly, the Sixth Circuit considered the principles of those cases applicable to a large school system such as the one existing in Memphis which in size is nearly equal to that of Prince George's County.

30. The Atlanta school case has been in litigation since 1958. The recent decisions in that case filed subsequent to the Supreme Court decisions in *Green, Alexander, Carter* and *Swann* give no support to the proposition that the constitutional standards required for school desegregation, including matters of timing, are inapplicable to large school systems. In Calhoun v. Cook, 332 F.Supp. 804 (N.D. Ga.1971), the Court held that if the Atlanta School Board adopted certain plans (excluding busing) to increase desegregation, then the Atlanta school system would be declared unitary and a dismissal of the desegregation suit would be ordered on January 1, 1972. Applying the constitutional standards set forth in *Swann,* the District Court refused to require busing to maximize desegregation because the "distances alone would require 40 minutes or more for each child transported and all of this [busing] would have to be achieved by a system which has no

school staff plan presented in this case is, as defendants have informed this Court, ready for mid-year (i. e., January 29, 1973) implementation as to all levels (elementary, junior high and senior high), that any such implementation should be delayed until the start of the next school year, i. e., September, 1973.[31]

In August of this year, this Court ordered the elementary school changeover to be effective January 29, 1973. The Fourth Circuit's observation in its October 12, 1972 opinion that "we perceive" only one substantive question "of substantiality" [32]—and that question is whether delay of implementation of the senior high plan until September 1, 1973 is appropriate—would seem, despite the Fourth Circuit's indicated suggestion that this Court also consider the question of delay at all levels of education after it had before it all of the evidence, to require this Court to pause most carefully before postponing any changeover,

---

[school] buses, no [school bus] drivers, and no funds with which to acquire and operate them" (332 F.Supp. at 808). In contrast to *Calhoun*, the desegregation remedy in this case involves bus rides averaging only 14 minutes in a school system which already buses nearly 50% of its students. Moreover, the implementation in this case of the staff plan involves busing only an additional 7.7% of the student population. The District Court's decision in the Atlanta case was appealed to the Fifth Circuit, which in Calhoun v. Cook, 451 F.2d 583 (5th Cir. 1971), vacated that portion of the District Court's opinion dismissing the action as of January 1, 1972, and remanded the case to the District Court to evaluate a proposed alternate plan. After procedural developments on remand threatened the delay of the implementation of a desegregation plan, the Fifth Circuit issued an interim order on October 6, 1972, Calhoun v. Cook, No. 72–2453, in which the Court stated:

> Faced with the inevitable delay in devising a final resolution of the appellate issues which this latest district court procedural development portends, we are required to consider interim measures which will desegregate this system *now*. Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).
>
> The Atlanta Public School System is hereby directed to proceed forthwith to prepare and submit to this court a student assignment plan to be effective at the commencement of the second quarter Nov. 27, 1972 * * *.

(Slip sheet, p. 2, ¶¶ 2 and 3). Notably, the Fifth Circuit cited *Alexander* in support of its order that Atlanta desegregate *"now"* (emphasis in original) with no indication that the constitutional standards set forth in *Alexander* concerning the speed with which desegregation plans must be implemented are not applicable to large school systems like Atlanta's. On November 6, 1972, Mr. Justice Powell denied a request for a stay of the Fifth Circuit's October 6, 1972 interim order. On November 24, 1972, the Fifth Circuit, in a final order in Calhoun v. Cook, 469 F.2d 1067, vacated the findings and conclusions of the District Court determining that the Atlanta Public School System as now operated is non-discriminatory and unitary, and remanded the case to the District Court to, *inter alia*, "enter an appropriate order requiring the Atlanta Public School System to prepare and submit to the district court a comprehensive desegregation plan covering student assignments in accordance with the guidelines contained in this Court's interim order of October 6, 1972 * * *" (p. 1068). Significantly, there was not a single statement, either express or implied, in any of these decisions concerning the desegregation of Atlanta schools that the constitutional standards in desegregation cases set forth by the United States Supreme Court, especially those set forth in *Brown I*, *Green*, *Alexander*, *Carter* and *Swann* are not appropriate with regard to large school systems involving around 100,000 students like the one in Atlanta.

31. In Robinson v. Shelby County Board of Education, 442 F.2d 255, 258 (6th Cir. 1971), Judge McCree specifically noted that the then current school year was almost over and delayed in an opinion *filed May 10, 1971* the change until the start of the 1971–72 school year. But that hardly speaks in support of the delay until September, 1973 requested herein by defendants; indeed by implication it would seem to speak to the contrary.

32. 468 F.2d 894.

at any level, beyond January 29, 1973. The School Board itself, in its resolution of August 1, 1972, proposed to implement changes as to all but elementary schools either before or at the latest by mid-year in January, 1973. Transfers are usually unwelcome at any time—but they hardly are as difficult for an individual student to adjust to if the student is one of many being transferred. The disruption of education, particularly of older students, by mid-year transfers has already been recognized by this Court in its August 31, 1972 opinion and *supra* herein. But, to make what is at best a most difficult decision, this Court concludes that as a matter of law, the defendants have not borne the burden of establishing reasons for delay beyond January 29, 1973 with regard to any grade other than the 12th grade. Accordingly, this Court is of the opinion that it does not have the discretionary authority to permit any such delay. But even if this Court did have such authority, this Court is far from certain that any further delay is advisable. The present disruptive effects of delay with its current unsettling effects upon students and parents speaks from the record in this case. Such an atmosphere can hardly be conductive to maximum educational accomplishment. Views to that effect were expressed candidly and vigorously by one School Board member and by one high school principal in testimony before this Court last August. Additionally, the policy and the practice apparently followed by a number of the School Board members,[33] of seeking at every stage and at every available moment, ever further delays, and of failing to exert affirmative leadership to effect required constitutional change, discourages

further delay until September 1973. But, in any event, in the view of this Court, the record in this case adds up to a lack of existence of discretion by this Court to permit delay beyond January 29, 1973 in view of the failure of defendants to shoulder their very heavy burden of showing the necessity of any further delay. In that connection, the record reflects that the School Board's emphasis in July, in August, and again in December of 1972, has been to seek and to justify delay; rather than to find the most palatable ways in which to change an unconstitutional school system which defendants have had over 18 years to cure. The record indeed even reflects that the determination, on the part of the School Board, to delay was so great that during the months between August 31, 1972 and December 7, 1972 the Board failed to give a sufficient green light to its very able staff members to enable them to ready a plan meeting *Brown-Swann* standards. Since December 7, 1972, the time which has elapsed has been requested and has been sorely needed by those staff members. Fortunately, their efforts in this month have proven most fruitful and have provided a workable constitutional plan, deemed educationally sound by plaintiffs and defendants alike, and ready for implementation—using that urgent word employed in *Green* (at 439 of 391 U.S., 88 S.Ct. 1689), *"now"*.

The School Board is today being ordered, in a separate document, to implement the plan attached thereto, i. e., the staff plan submitted December 26, 1972, (a) on January 29, 1973 as to all grades except the 12th grade, and (b) as to the 12th grade at the commencement of

---

33. In early July, 1972, in chambers conferences among Court and counsel, this Court was informed that the Board was deadlocked 4 to 4 in connection with the approval of a plan which plaintiffs' counsel believed met constitutional requirements and would recommend to this Court. That plan failed to gain more than 4 votes and was stillborn by a 4–4 tie. Indeed, at all times since July, 1972, this Court has been informed that at no time has there been more than 4 out of 8 or 9 members who were ready to recommend to this Court *any* plan which in the opinion of this Court even approaches compliance with constitutional standards.

the 1973–74 school year in September, 1973. That Order, in this Court's opinion, is a final Order as to the issue of student attendance. Other issues pertaining to faculty, administration, school construction, and legal fees and reimbursable costs of plaintiffs and their counsel are reserved for subsequent determination by this Court. Additionally, this Court will, for the time being, retain jurisdiction as instructed by the Supreme Court in Raney v. Board of Education, 391 U.S. 443, 449, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), with regard to the student attendance plan being approved and decreed today, in order that this Court may supervise the implementation of the same.